RACINE EDUCATION ASSOCIATION, Petitioner-Appellant,†

v.

WISCONSIN EMPLOYMENT RELATIONS COMMISSION and Racine Unified School District, Respondents-Respondents.

Court of Appeals

*No. 99–0765. Submitted on briefs December 6, 1999.—Decided June 21, 2000.*

## 2000 WI App 149

(Also reported in 616 N.W.2d 504.)

†Petition to review denied.

34

On behalf of the petitioner-appellant, the cause was submitted on the briefs of *Robert C. Kelly* and *Brett C. Petranech* of *Kelly & Kobelt* of Madison, and of counsel, *Robert K. Weber* of *Weber & Cafferty, S.C.* of Racine.

On behalf of the respondent-respondent Wisconsin Employment Relations Commission, the cause was submitted on the brief of *John D. Niemisto*, assistant attorney general, and *James E. Doyle*, attorney general. On behalf of the respondent-respondent Racine Unified School District, the cause was submitted on the brief of *Douglas E. Witte* of *Melli, Walker, Pease & Ruhly, S.C.* of Madison.

Before Nettesheim, Anderson and Snyder, JJ.

¶ 1.  SNYDER, J.   Racine Education Association (REA) appeals from an order affirming a Wisconsin Employment Relations Commission (WERC) decision finding that Racine Unified School District (the District) submitted a qualified economic offer (QEO)[1]

---

[1] A QEO is an offer by the employer to maintain fringe benefits and salary increases while the parties complete their collective bargaining agreement. When a QEO is submitted, the

within the meaning of WIS. STAT. § 111.70(1)(nc) (1995–96)[2] and WIS. ADMIN. CODE § ERC 33.10. The first issue raised by REA concerns when a QEO comes into existence. The District and WERC contend that a QEO exists when an employer commits itself to comply with § 111.70(1)(nc) by stating its intent to (1) maintain all fringe benefits and its percentage contribution to such benefits (as existed under the previous collective bargaining agreement) and (2) provide the minimum salary increase (or decrease) pursuant to § 111.70(1)(nc). REA counters that a QEO requires much more, including mathematical accuracy of the components of the QEO. REA states that a "QEO is determined by its numerical content, not by its semantic form."

¶ 2.   We are persuaded that QEO existence is fundamentally distinct from a QEO's implementation and numerical calculations. A QEO is made when an employer submits an offer to maintain fringe benefits and minimum salary increases consistent with WIS. STAT. § 111.70(1)(nc). Once such an offer is made, any issues concerning the calculation of fringe benefit costs and salaries may still be addressed but will not render a QEO invalid.

¶ 3.   REA's second argument goes to the accuracy of the content of the QEO. REA raises several issues concerning how QEO costs were computed in this case. The most compelling of these arguments pertains to WERC's ruling that a QEO shall contain minimum

---

employer avoids compulsory arbitration on economic issues such as wages, hours or conditions of employment. *See Madison Teachers, Inc. v. Madison Metro. Sch. Dist.*, 197 Wis. 2d 731, 743, 541 N.W.2d 786 (Ct. App. 1995).

[2] All references to the Wisconsin Statutes are to the 1995–96 version unless otherwise noted.

salary increases without any upper limitations. We conclude that while this determination is supported by WIS. STAT. § 111.70(1)(nc), a subsequent legislative amendment reveals the legislature's intent to limit such salary increases to "the minimum possible cost to the municipal employer." *See* § 111.70(4)(cm)8p. Because WERC's interpretation of this statute was incorrect, we reverse and remand to the circuit court with instructions to remand to WERC for further proceedings consistent with this opinion. REA's other arguments, however, are unavailing; therefore, we affirm on the remaining issues.

## BACKGROUND

¶ 4.    REA is a collective bargaining representative for employees of the District. The REA bargaining unit is described as "all regular full-time and regular part-time certified teaching personnel." For the period of August 20, 1990, to August 24, 1992, the District and REA executed an agreement covering its regular full-time and part-time employees. Thereafter, the parties began negotiating the terms of a successor collective bargaining agreement. At issue in this case is the contract period for the 1993–94 and 1994–95 school years.[3]

¶ 5.    On September 25, 1995, the District submitted an economic offer to REA, which stated:

> This is the District's submission of the QEO for the period of time after June 30, 1993 to July 1, 1995. In accordance with ERB 33.10(3), the District states:

---

[3] In November 1995, the District and REA executed a contract for the period of August 25, 1992, through August 24, 1993.

1.  For any period of time after June 30, 1993, covered by the proposed collective bargaining agreement, the District shall maintain all fringe benefits and its percentage contribution toward the cost thereof as required by s. 111.70(1)(nc), Stats.

2.  For each 12 month period or portion thereof which commences July 1, 1993, and is covered by this agreement, the District shall provide the minimum increase in salary which s. 111.70(1)(nc)1, Stats., requires for the purposes of a qualified economic offer, or may provide the decrease in salary which s. 111.70(1)(nc)1, Stats., allows for the purposes of a qualified economic offer.

Attached to this letter is the Qualified Economic Offer forms A and B as attested to by Robert Stepien, Assistant Superintendent of Business Services. If you have any questions or concerns, District representatives will be available to discuss those issues.

The District's offer was accompanied by Forms A and B, which are prescribed by WERC pursuant to WIS. STAT. § 111.70(4)(cm)8s and the appendix to WIS. ADMIN. CODE ch. ERC 33. Forms A and B set forth the directions for calculating the costs associated with maintaining fringe benefits and providing increased salaries.

¶ 6.   On September 29, 1995, the District gave notice to REA that it intended to implement its QEO in October 1995 under the condition that WERC determined that they were deadlocked in their negotiations toward a collective bargaining agreement. The District indicated that the implementation would occur as follows:

1.  All persons who are eligible for a step increase for the years 1993–94 and 1994–95 will be moved to the appropriate step.[4] This has been done.

2.  All persons who are eligible for a lane change for the years 1993–94 and 1994–95 will be moved to the appropriate lane.[5] This has been done.

3.  The teachers' and psychologists' salary schedule(s) will be advanced for the year 1993–94 by 1.04497%. The teachers' and psychologists' salary schedule for the year 1994–95 will be advanced by 1.28708%. Payment for each school year will be made retroactively to July 1, 1993 and July 1, 1994. Retroactive payment will be made as soon as possible after October 15, 1995 or after the investigation's determination of deadlock whichever is later.

All fringe benefits and the teacher percentage contribution toward the cost of these benefits each year will remain the same. Since the 1993–95 contract year has expired, the District will not retroactively collect from the teachers the increased health plan contributions which would be necessary to maintain the teachers' same percentage contribution to that benefit. However, that amount will be reflected in the contribution made by teachers starting with the 1995–96 school year and it will continue to be adjusted yearly thereafter as appropriate.

---

[4] A "step" corresponds to an employee's level of teaching experience on the school district's salary schedule. For each year of teaching completed, a teacher moves up one step to a higher rate of pay.

[5] A "lane" refers to each track on the salary schedule. For each additional level of education attained, a teacher moves over one track to a higher rate of pay.

¶ 7. In January 1996, WERC declared the parties deadlocked and therefore the District implemented its QEO. In February 1996, REA filed a motion with WERC to review the District's implementation of the QEO. REA objected to numerous calculations made by the District in its QEO.

¶ 8. Hearings were held on March 15, April 9, October 4 and October 31, 1996, at which REA argued that the District's offer did not constitute a QEO within the meaning of WIS. STAT. § 111.70(1)(nc) and WIS. ADMIN. CODE ch. ERC 33.[6] REA complained that the District's QEO did not strictly conform to statutory requirements regarding the substance and procedure for submitting a QEO. In particular, REA claimed that the District had failed to submit a QEO. REA also contested the District's calculations as to past years' salary figures and fringe benefit costs on the grounds that (1) § 111.70(1)(nc) does not permit a QEO above the minimum requirements, (2) premium equivalents were improperly used instead of actual costs, (3) workers' compensation benefits should have been included in the costs and (4) other figures such as stop-loss insurance costs, medical management service costs and an inflation factor should not have been included.

¶ 9. WERC rejected REA's arguments. It first determined that a QEO comes into existence when an employer commits itself to do what is statutorily required to have a valid QEO. WERC found that the District had submitted a QEO because it committed itself to comply with WIS. STAT. § 111.70(1)(nc) by using the words found in WIS. ADMIN. CODE § ERC 33.10(3)(a)1 and 2. Section ERC 33.10(3)(a)1 and 2 provide what is necessary for QEO existence. WERC next

---

[6] WISCONSIN ADMIN. CODE ch. ERC 33 was previously referred to as ch. ERB 33.

decided that any inaccuracies or problems with Forms A and B did not render the QEO nonexistent or invalid because the Forms are not a part of the QEO, and the completion of them is not a condition precedent to making them. WERC also held that employers should have the opportunity to make corrections and that errors, if corrected, did not forfeit an employer's right to make a QEO.

¶ 10.  On February 17, 1998, WERC issued an order ruling that the District's offer was a QEO and that its implementation was consistent with the law, apart from certain corrections that needed to be made in Forms A and B.[7]

¶ 11.  The circuit court concurred with WERC's decision, concluding that a QEO existed upon the District's commitment to comply with WIS. STAT. § 111.70(1)(nc). The court then rejected REA's contention that § 111.70(1)(nc) does not permit a QEO above the minimum requirements, that premium equivalents were improperly used instead of actual costs, that workers' compensation benefits should have been included and that other costs should have been excluded. REA appeals.

## QEO LAW

¶ 12.  We begin our discussion by setting forth the applicable law under WIS. STAT. § 111.70(1)(nc) of Wisconsin's Municipal Employment Relations Act (MERA) and WIS. ADMIN. CODE § ERC 33.10. Section 111.70(1)(nc) provides the statutory definition of a QEO, which is set forth in its entirety below:

---

[7] These corrections required the District to provide REA with forms that had been properly attested to by the District treasurer and to make summer school and proration recalculations.

(nc) 1. "Qualified economic offer" means an offer made to a labor organization by a municipal employer that includes all of the following, except as provided in subd. 2.:

a. A proposal to maintain the percentage contribution by the municipal employer to the municipal employes' existing fringe benefit costs as determined under sub. (4) (cm) 8s., and to maintain all fringe benefits provided to the municipal employes in a collective bargaining unit, as such contributions and benefits existed on the 90th day prior to expiration of any previous collective bargaining agreement between the parties, or the 90th day prior to commencement of negotiations if there is no previous collective bargaining agreement between the parties.

b. In any collective bargaining unit in which the municipal employe positions were on August 12, 1993, assigned to salary ranges with steps that determine the levels of progression within each salary range during a 12-month period, a proposal to provide for a salary increase of at least one full step for each 12-month period covered by the proposed collective bargaining agreement, beginning with the expiration date of any previous collective bargaining agreement, for each municipal employe who is eligible for a within range salary increase, unless the increased cost of providing such a salary increase, as determined under sub. (4) (cm) 8s., exceeds 2.1% of the total compensation and fringe benefit costs for all municipal employes in the collective bargaining unit for any 12-month period covered by the proposed collective bargaining agreement, or unless the increased cost required to maintain the percentage contribution by the municipal employer to the municipal employes' existing fringe benefit costs and to maintain all fringe benefits provided to the municipal employes, as

determined under sub. (4) (cm) 8s., in addition to the increased cost of providing such a salary increase, exceeds 3.8% of the total compensation and fringe benefit costs for all municipal employes in the collective bargaining unit for any 12-month period covered by the proposed collective bargaining agreement, in which case the offer shall include provision for a salary increase for each such municipal employe in an amount at least equivalent to that portion of a step for each such 12-month period that can be funded after the increased cost in excess of 2.1% of the total compensation and fringe benefit costs for all municipal employes in the collective bargaining unit is subtracted, or in an amount equivalent to that portion of a step for each such 12-month period that can be funded from the amount that remains, if any, after the increased cost of such maintenance exceeding 1.7% of the total compensation and fringe benefit costs for all municipal employes in the collective bargaining unit for each 12-month period is subtracted on a prorated basis, whichever is the lower amount.

c. A proposal to provide for an average salary increase for each 12-month period covered by the proposed collective bargaining agreement, beginning with the expiration date of any previous collective bargaining agreement, for the municipal employes in the collective bargaining unit at least equivalent to an average cost of 2.1% of the total compensation and fringe benefit costs for all municipal employes in the collective bargaining unit for each 12-month period covered by the proposed collective bargaining agreement, beginning with the expiration date of any previous collective bargaining agreement, including that percentage required to provide for any step increase and any increase due to a promotion or the attainment of increased professional qualifications, as determined under

43

sub. (4) (cm) 8s., unless the increased cost of providing such a salary increase, as determined under sub. (4) (cm) 8s., exceeds 2.1% of the total compensation and fringe benefit costs for all municipal employes in the collective bargaining unit for any 12-month period covered by the proposed collective bargaining agreement, or unless the increased cost required to maintain the percentage contribution by the municipal employer to the municipal employes' existing fringe benefit costs and to maintain all fringe benefits provided to the municipal employes, as determined under sub. (4) (cm) 8s., in addition to the increased cost of providing such a salary increase, exceeds 3.8% of the total compensation and fringe benefit costs for all municipal employes in the collective bargaining unit for any 12-month period covered by the collective bargaining agreement, in which case the offer shall include provision for a salary increase for each such period for the municipal employes covered by the agreement at least equivalent to an average of that percentage, if any, for each such period of the prorated portion of 2.1% of the total compensation and fringe benefit costs for all municipal employes in the collective bargaining unit that remains, if any, after the increased cost of such maintenance exceeding 1.7% of the total compensation and fringe benefit costs for all municipal employes in the collective bargaining unit for each 12-month period and the cost of a salary increase of at least one full step for each municipal employe in the collective bargaining unit who is eligible for a within range salary increase for each 12-month period is subtracted from that total cost.

2. "Qualified economic offer" may include a proposal to provide for an average salary decrease for any 12-month period covered by a proposed collective bargaining agreement, beginning with the

44

expiration date of any previous collective bargaining agreement, for the municipal employes covered by the agreement, in an amount equivalent to the average percentage increased cost of maintenance of the percentage contribution by the municipal employer to the municipal employes' existing fringe benefit costs, as determined under sub. (4) (cm) 8s., and the average percentage increased cost of maintenance of all fringe benefits provided to the municipal employes represented by a labor organization, as such costs and benefits existed on the 90th day prior to commencement of negotiations, exceeding 3.8% of the total compensation and fringe benefit costs for all municipal employes in the collective bargaining unit required for maintenance of those contributions and benefits for that 12-month period if the increased cost of maintenance of those costs and benefits exceeds 3.8% of the total compensation and fringe benefit costs for all municipal employes in the collective bargaining unit for that 12-month period.

¶ 13.   To aid in the implementation of WIS. STAT. § 111.70(1)(nc), WERC understandably created administrative rules interpreting the statutory definition of a QEO. WISCONSIN ADMIN. CODE § ERC 33.10 addresses several aspects pertaining to QEOs, namely, content, existence, implementation and compliance. Section ERC 33.10(2) provides:

> CONTENTS. A qualified economic offer is a proposal in which the municipal employer obligates itself to at least comply with the salary and fringe benefit requirements of s. 111.70(1)(nc), Stats., for the entirety of any collective bargaining agreement for any period after June 30, 1993.

¶ 14.   Under WIS. ADMIN. CODE § ERC 33.10(3), WERC set forth the minimum requirements for QEO existence:

EXISTENCE. (a) A qualified economic offer exists if the municipal employer submits an offer to a labor organization which at least states the following:

1. For any period of time after June 30, 1993, covered by the proposed collective bargaining agreement, the municipal employer shall maintain all fringe benefits and its percentage contribution toward the cost thereof as required by s. 111.70(1)(nc), Stats.

2. For each 12 month period or portion thereof which commences July 1, 1993, and is covered by this agreement, the municipal employer shall provide the minimum increase in salary which s. 111.70(1)(nc)1., Stats., requires for the purposes of a qualified economic offer, or may provide the decrease in salary which s. 111.70(1)(nc)2., Stats., allows for the purposes of a qualified economic offer.

(b)   At the time it submits a qualified economic offer to the labor organization or 60 days prior to the stated expiration date of any existing collective bargaining agreement, whichever is earlier, the municipal employer's treasurer and superintendent or business manager shall provide the labor organization with completed commission qualified economic offer calculation Forms A and B. Forms A and B are appendices to this chapter. When completing Forms A and B, the treasurer and superintendent or business manager shall use all available cost and employe complement information and shall attest to the accuracy of the information. If additional cost or employe complement information becomes available, the treasurer and superintendent or business manager shall pro-

46

vide the labor organization with revised qualified economic offer calculation Forms A and B.

## DISCUSSION

### A. QEO Existence

### 1. Standard of Review

¶ 15.   The issues raised by REA require that we interpret the above provisions. The ultimate goal of statutory interpretation is to ascertain the intent of the legislature. *See Rolo v. Goers*, 174 Wis. 2d 709, 715, 497 N.W.2d 724 (1993). We first look to the language of the statute itself. *See UFE Inc. v. LIRC*, 201 Wis. 2d 274, 281, 548 N.W.2d 57 (1996). If the plain meaning of the statute is clear, we do not look to rules of statutory construction or other extrinsic aids. *See id.* Instead, we apply the clear meaning of the statute to the facts of the case. *See id.* at 281–82. However, if the statute is ambiguous, we may examine the scope, history, subject matter and purpose of the statute. *See id.* at 282. Furthermore, if the administrative agency has been charged with the statute's enforcement, a court may also look to the agency's interpretation. *See id.*

¶ 16.   As an appellate court, we review WERC's decision, not the circuit court's. *See Jefferson County v. WERC*, 187 Wis. 2d 647, 651, 523 N.W.2d 172 (Ct. App. 1994). Whether WERC properly interpreted WIS. STAT. § 111.70(1)(nc) is a question of law, and we are not bound by the agency's interpretation. *See Harnischfeger Corp. v. LIRC*, 196 Wis. 2d 650, 659, 539 N.W.2d 98 (1995). In certain circumstances, however, it is appropriate to defer to an agency's interpretation. *See UFE*, 201 Wis. 2d at 284. Where the agency's "experience,

technical competence, and specialized knowledge aid the agency in its interpretation and application of the statute, the agency's conclusions are entitled to deference by the court." *West Bend Educ. Ass'n v. WERC*, 121 Wis. 2d 1, 12, 357 N.W.2d 534 (1984).

¶ 17. Three levels of deference are granted agency decisions—great weight deference, due weight deference and de novo review. *See UFE*, 201 Wis. 2d at 284. REA argues that de novo review is appropriate here. A de novo standard applies when the issue before the agency is one of first impression or when an agency's stance on an issue has been "so inconsistent so as to provide no real guidance." *Id.* at 285. REA asserts that WERC has decided only three cases addressing the existence of a QEO prior to the case at bar, and in two of those cases it took a position contrary to its position here. According to REA, in both of those cases, "WERC determined based on the content of the offers rather than their form that the offers were not QEOs under § 111.70(1)(nc)."

¶ 18. WERC counters that its decision should be given great weight deference based on its expertise and experience analyzing MERA and the relevant administrative code provisions. Great weight deference is proper where the legislature has authorized the agency to administer the statute, the agency's interpretation is long standing, the agency has utilized its expertise and specialized knowledge in coming to its interpretation, and the agency's interpretation will further the uniformity and consistency of the statute's application. *See UFE*, 201 Wis. 2d at 284. WERC acknowledges, however, that it has not addressed many disputes involving QEOs since the law went into effect in 1993. WERC also relies upon WIS. STAT. § 227.57(10), which provides that on review "*due weight* shall be accorded

the experience, technical competence, and specialized knowledge of the agency involved." (Emphasis added.)

¶ 19. The District stands between REA and WERC, contending that the middle level of deference is applicable. Due weight is considered when

> the agency has some experience in an area, but has not developed the expertise which necessarily places it in a better position to make judgments regarding the interpretation of the statute than a court. The deference allowed an administrative agency under due weight is not so much based upon its knowledge or skill as it is on the fact that the legislature has charged the agency with the enforcement of the statute in question. Since in such situations the agency has had at least one opportunity to analyze the issue and formulate a position, a court will not overturn a reasonable agency decision that comports with the purpose of the statute unless the court determines that there is a more reasonable interpretation available.

*UFE*, 201 Wis. 2d at 286–87.

¶ 20. We agree with the District that WERC's decision should be accorded due weight. The legislature has charged WERC with the duty of applying and enforcing WIS. STAT. ch. 111. *See School Dist. v. WERC*, 121 Wis. 2d 126, 132–33, 358 N.W.2d 285 (1984). In addition, WERC has particular expertise in the area of collective bargaining under WIS. STAT. § 111.70. *See Racine Educ. Ass'n v. WERC*, 214 Wis. 2d 353, 358, 571 N.W.2d 887 (Ct. App. 1997). Although WERC's consideration of the issue of QEO existence is not one of long standing, it has resolved the issue at least three times. Furthermore, as we explain below, we are not convinced that WERC's prior decisions have been "so

inconsistent so as to provide no real guidance." *UFE*, 201 Wis. 2d at 285.

¶ 21. In a recent WERC decision, *Shorewood Education Ass'n*, Dec. No. 29259 (WERC Dec. 5, 1997), WERC contemplated the issue of QEO existence and came to the same conclusion as in this case. WERC stated:

> As long as the school district maintains its commitment to honor Sec. 111.70(1)(nc), Stats., it has a qualified economic offer and access to interest arbitration as to economic issues is barred by Sec. 111.70(4)(cm)5s, Stats.

WERC's analysis in *Shorewood Education* is identical to its position here because in both cases WERC found language in the school districts' offers which mirrored the provisions in WIS. ADMIN. CODE § ERC 33.10(3)(a) and ruled that the districts' stated commitment to compliance with WIS. STAT. § 111.70(1)(nc) was sufficient to create a QEO.

¶ 22. REA, however, points to two earlier WERC decisions which it contends rely upon an analysis inconsistent with its more recent approach in *Shorewood Education* and the present case. In *Campbellsport Education Ass'n*, Dec. No. 27578–B (WERC Aug. 17, 1994), *rev'd*, No. 94–CV–518 (Fond du Lac Cty. Cir. Ct. Feb. 6, 1995), and in *Madison Teachers Inc.*, Dec. No. 27612–B (WERC Apr. 6, 1995), WERC contemplated QEO existence under WIS. STAT. § 111.70(1)(nc) and the nonstatutory provision of 1993 Wis. Act 16, § 9120(2x).[8] In *Campbellsport Education*,

---

[8] 1993 Wis. Act 16, § 9120(2x) charged WERC with determining whether an employer had submitted a QEO when the contract period spanned the effective date of 1993 Wis. Act 16 (enacting WIS. STAT. § 111.70(1)(nc), effective August 12, 1993).

WERC examined Campbellsport School District's offer concerning health insurance benefits and concluded that a QEO did not exist because the offer did not maintain the existing fringe benefits and the appropriate percentage contribution toward such benefits. In *Madison Teachers*, WERC found a QEO lacking because Madison Metropolitan School District's offer did not maintain certain fringe benefits relating to holidays and snow days.

¶ 23. Although WERC utilized a different QEO analysis in *Campbellsport Education* and *Madison Teachers* than in *Shorewood Education* and the present case, we are not convinced that its present approach belies its earlier analysis. In the prior cases, the school districts' offers did not contain the language prescribed by WIS. ADMIN. CODE § ERC 33.10(3) because the offers were submitted prior to the effective date of § ERC 33.10(3).[9] As such, WERC looked at the specific terms of the offer for a commitment to comply with the salary and fringe benefit requirements. After *Campbellsport Education* and *Madison Teachers*, WERC looked for language consistent with § ERC 33.10(3). For purposes of determining the level of agency deference, we do not see WERC's later analysis

---

[9] The offers in *Campbellsport Education Ass'n*, Dec. No. 27578–B (WERC Aug. 17, 1994), *rev'd*, No. 94–CV–518 (Fond du Lac Cty. Cir. Ct. Feb. 6, 1995), were submitted by March 1, 1993, and in *Madison Teachers Inc.*, Dec. No. 27612–B (WERC Apr. 6, 1995), by March 26, 1993. The language in WIS. ADMIN. CODE § ERC 33.10(3) subsequently came into effect on October 13, 1993, pursuant to an emergency administrative rule promulgated by WERC. As WERC explained in *Madison Teachers*, under 1993 Wis. Act 16, § 9120(2x) neither the school district nor the teachers association "ha[d] the right to modify the final offers they made prior to the existence of Act 16."

as necessarily inconsistent with its earlier approach. Therefore, we grant WERC's legal interpretation due weight.

¶ 24. We now consider the scope of our review of REA's appeal. By arguing that WIS. ADMIN. CODE § ERC 33.10 is incompatible with WIS. STAT. § 111.70(1)(nc), REA appears to be challenging the validity of WERC's administrative provisions. REA, however, can only raise an objection to an administrative rule's validity through WIS. STAT. § 227.40. Section 227.40(1) declares that "the exclusive means of judicial review of the validity of a rule shall be an action for declaratory judgment as to the validity of such rule brought in the circuit court for Dane county." *Id.*; *see State v. Town of Linn*, 205 Wis. 2d 426, 448, 556 N.W.2d 394 (Ct. App. 1996). REA did not pursue an action for declaratory judgment. As such, we do not address the validity of § ERC 33.10.

¶ 25. Our review instead falls under WIS. STAT. § 227.57. Section 227.57(5) provides that an agency action may be set aside or modified if the agency has "erroneously interpreted a provision of law and a correct interpretation compels a particular action." Section 227.57(8) states that a court shall reverse or remand an agency decision if the

> agency's exercise of discretion is outside the range of discretion delegated to the agency by law; is inconsistent with an agency rule . . .; or is otherwise in violation of a constitutional or statutory provision; but the court shall not substitute its judgment for that of the agency on an issue of discretion.

Given this standard of review, our focus is on WERC's interpretation of the law and exercise of its discretion, not the validity of its rules.

## 2. Analysis

¶ 26. In its February 17, 1998 decision, WERC reviewed WIS. STAT. § 111.70(1)(nc) and WIS. ADMIN. CODE § ERC 33.10 and reasoned that "where a school district's offer commits it to do whatever is statutorily required to have a qualified economic offer, it has made a qualified economic offer." WERC determined that because the District's "use of the words of ERC [§ ] 33.10(3)(a)1 and 2 makes the District's commitment clear and unmistakable," the District had made a QEO.

¶ 27. According to REA, WERC's conclusion is wrong because its administrative rules permit an employer to establish the existence of a QEO by merely including the language from WIS. ADMIN. CODE § ERC 33.10(3)(a), and no further examination is required by WERC to find a QEO. REA argues that both "the statute and its legislative history clearly indicate that the making of a QEO was not meant to be such a cursory exercise."

¶ 28. The District holds the view that REA has failed to recognize the difference between "making" a QEO and "implementing" or "calculating" a QEO. According to the District, a QEO comes into existence when an employer states that it will (1) maintain all fringe benefits and its percentage contribution to all fringe benefits and (2) provide the minimum salary increase (or decrease) permitted under the statute. The District asserts that its September 25, 1995 QEO satisfied this requirement, noting that its offer included the language contained in WIS. ADMIN. CODE § ERC 33.10(3)(a). It contends that separate procedures govern the calculation and implementation of a QEO and that any errors made in the original calculations do not affect whether a QEO was made.

53

¶ 29. Similarly, WERC remarks that when an employer commits to the percentages which are tied to fringe benefit costs and salary increases, it has "initiated the QEO procedures" and therefore has created a QEO. WERC states that any disagreement as to the mathematical calculations of the percentages for salary and fringe benefits concerns WERC's forms (Forms A and B).

¶ 30. We find the District's and WERC's arguments persuasive. In enacting WIS. STAT. § 111.70(1)(nc), the legislature intended to set forth at length what constitutes a QEO. Beginning with § 111.70(1)(nc)1.a, the statute requires that the employer's offer propose to (1) maintain the fringe benefits which existed on the ninetieth day prior to the expiration of the prior contract and (2) maintain the same percentage contribution by the employer for those fringe benefits as existed on the ninetieth day prior to the expiration of the previous agreement. Subparagraph (a) cites to § 111.70(4)(cm)8s for determining the existing fringe benefit costs.

¶ 31. Next, WIS. STAT. § 111.70(1)(nc)1.b and c address salary increases. Subparagraph (b) states that the employer shall provide for a salary increase of at least one step for each twelve-month period covered by the proposed collective bargaining agreement. The one-step salary increase, however, is contingent upon the increased costs of providing the raise. If the cost of providing a salary increase exceeds 2.1% of the total costs for compensation and fringe benefits, or if the increased costs required to maintain all fringe benefits and the percentage contribution to those benefits, in addition to the increased cost of providing a salary increase, exceeds 3.8% of the total costs for compensation and fringe benefits, then a different approach is

taken. Under this alternative approach, the salary increase will be a function of an amount equal to that portion of a step "that can be funded after the increased cost in excess of 2.1% of the total compensation and fringe benefit costs for all municipal employes in the collective bargaining unit is subtracted," or "that can be funded from the amount that remains, if any, after the increased cost of such maintenance exceeding 1.7% of the total compensation and fringe benefit costs for all municipal employes in the collective bargaining unit for each 12-month period is subtracted on a prorated basis, whichever is the lower amount." Section 111.70(1)(nc)1.b. Throughout, subp. (b) cites to § 111.70(4)(cm)8s for calculating the increased costs of salary increases and fringe benefits.

¶ 32. WISCONSIN STAT. § 111.70(1)(nc)1.c provides for an average salary increase "at least equivalent to an average cost of 2.1% of the total compensation and fringe benefit costs . . . including that percentage required to provide for any step increase and any increase due to a promotion or the attainment of increased professional qualifications." Subparagraph (c) qualifies its salary increase with contingencies similar to subp. (b). Like subps. (a) and (b), subp. (c) cites to § 111.70(4)(cm)8s for determining salary and fringe benefit costs.

¶ 33. Finally, WIS. STAT. § 111.70(1)(nc)2 states that if the cost of fringe benefits exceeds 3.8% of the total compensation and fringe benefit costs, then a salary decrease can occur. Section 111.70(4)(cm)8s is further referenced for deciphering fringe benefit costs.

¶ 34. While lengthy and complex, WIS. STAT. § 111.70(1)(nc) provides only the basic structure of a QEO. Through § 111.70(1)(nc)'s repeated references to § 111.70(4)(cm)8s, it becomes clear that the details of a

QEO are formulated by WERC's forms, which are authorized under § 111.70(4)(cm)8s.[10] Section 111.70(4)(cm)8s sanctions WERC to prescribe forms for making the cost calculations associated with maintaining fringe benefits and providing salary increases. Complying with the legislature's directive, WERC has created Forms A and B.[11] These forms are appended to WIS. ADMIN. CODE ch. ERC 33 and must be submitted at the time the school district presents its QEO.[12] The forms require the district to calculate "base year" compensation costs attributable to employees represented by the union on the ninetieth day prior to expiration of

[10] WISCONSIN STAT. § 111.70(4)(cm)8s provides in pertinent part:

'Forms for determining costs.' The commission shall prescribe forms for calculating the total increased cost to the municipal employer of compensation and fringe benefits provided to school district professional employes. The cost shall be determined based upon the total cost of compensation and fringe benefits provided to school district professional employes who are represented by a labor organization on the 90th day before expiration of any previous collective bargaining agreement between the parties . . . . In each collective bargaining unit to which subd. 5s. applies, the municipal employer shall transmit to the commission and the labor organization a completed form for calculating the total increased cost to the municipal employer of compensation and fringe benefits provided to the school district professional employes covered by the agreement as soon as possible after the effective date of the agreement.

[11] WISCONSIN ADMIN. CODE ch. ERC 33 appendix also contains Form C, providing instructions for developing a QEO, and Form D, giving notice to WERC and the labor organization of the total costs calculated in Forms A and B.

[12] Alternatively, Forms A and B are to be submitted sixty days before the expiration date of any existing collective bargaining agreement if such submission comes before WERC's QEO submission. See WIS. ADMIN. CODE § ERC 33.10(3)(b).

the current or most recently expired collective bargaining agreement. The district then calculates its QEO as a percentage of these base year costs.

¶ 35.   REA would have us interpret WIS. STAT. § 111.70(1)(nc) to require numerical accuracy in Forms A and B as a prerequisite to QEO existence. We disagree with this interpretation. The calculations made in Forms A and B are separate from the QEO. Although § 111.70(4)(cm)8s is cited numerous times by § 111.70(1)(nc), § 111.70(4)(cm)8s does not itself specify how each and every calculation should be made. Rather, the statute simply authorizes WERC to establish forms for deciphering costs and that such costs should be based upon compensation and fringe benefit costs on the ninetieth day before the expiration of the previous collective bargaining agreement. Form A details approximately eighteen steps for figuring the applicable costs. Forms A and B are a product of WERC's rule-making authority, and we do not intend to review their sufficiency.

¶ 36.   Next, we find instructive WERC's response to REA's argument:

> When creating and adopting ERC 33, we considered the question of whether errors in Forms A and B . . . were matters which could be corrected or were matters which should allow the union to have access to interest arbitration of economic issues. For several important reasons, we concluded that school districts should have the opportunity to make corrections and that errors, if corrected, do not forfeit a school district's right to make a qualified economic offer. All of these reasons relate to the legislature's public policy direction to us in Sec. 111.70(6), Stats., that settlement procedures be "fair." (Footnote omitted.)

WERC continues:

> [WISCONSIN STAT. § 111.70(1)(nc) and WIS. ADMIN. CODE § ERC 33.10] are somewhat complex and require complicated mathematical computations. In this context, we concluded it would not be a "fair" procedure if erroneous assumptions about the meaning of the statute or rules or mathematical errors deprived the employer of the right to make a qualified economic offer. In our opinion, it is "fair" to require the employer to do its best to provide accurate information in Forms A and B and to do its best when implementing its qualified economic offer. We further believe that if mistakes are made, it is "fair" that there be the opportunity to remedy those mistakes.

¶ 37. We concur that fairness cannot support REA's demand that mathematical precision in Forms A and B be a precondition to QEO existence. As WERC notes, the legislature has declared a policy of providing a "fair, speedy, effective" procedure for settling collective bargaining disputes. *See* WIS. STAT. § 111.70(6). Such a policy would be hampered if any and all errors prevented QEO existence. The alternative is more appropriate. An employer must make a commitment to provide a mathematically accurate offer. Once such commitment is found, a QEO comes into existence.

¶ 38. REA, however, is not without a remedy. The law provides that after an employer submits its economic offer, and WERC determines that the offer suffices as a QEO, the employer may then implement the QEO if the parties are found to be deadlocked in their contract negotiations. *See* WIS. ADMIN. CODE § ERC 33.10(5)(a). If the labor organization wishes to contest the QEO, it may do so by bringing a motion before WERC to review implementation of the QEO.

"Any dispute that the salary and fringe benefits have been or will be implemented in a manner consistent [with] s. 111.70(1)(nc), Stats., and this chapter shall be filed by the labor organization with the commission as a motion to review implementation." Section ERC 33.10(6).

¶ 39. Here, REA brought such a motion to review implementation of the District's QEO. REA objected to certain QEO calculations and WERC reviewed its objections and subsequently ordered that corrections be made within Forms A and B. REA, therefore, was able to present its objections to the calculations.

¶ 40. REA asserts that other provisions from WIS. STAT. § 111.70 support its reading of the statute. REA points to § 111.70(4)(cm)5s, which states:

> In a collective bargaining unit consisting of school district professional employes, the municipal employer or the labor organization may petition the commission to determine whether the municipal employer has submitted a qualified economic offer. *The commission shall appoint an investigator for that purpose.* If the investigator finds that the municipal employer has submitted a qualified economic offer, the investigator shall determine whether a deadlock exists between the parties with respect to all economic issues.[13] (Emphasis added.)

REA maintains that there would be no point in appointing an investigator to determine whether a

---

[13] The District contends that language in WIS. STAT. § 111.70(4)(cm)5s is inapplicable to this case because it did not appear in the 1993 version. However, the amendments adding the above language became effective July 29, 1995, *see* 1995 Wis. Act 27, § 3794k, and the District's QEO was submitted on September 26, 1995. We see no reason why the language in § 111.70(4)(cm)5s should not apply.

QEO exists if QEO existence depended solely upon the inclusion of the language contained in WIS. ADMIN. CODE § ERC 33.10(3)(a)1 and 2. We are not so certain.

¶ 41. While WIS. STAT. § 111.70(4)(cm)5s certainly permits the appointment of an investigator for the purpose of determining QEO existence, this passage does not offer any further indication as to when a QEO is made. Contrary to REA's contention, the use of an investigator is not necessarily more justified if QEO existence is a function of accurate cost calculations within Forms A and B than if it is a function of the employer's commitment to comply with § 111.70(1)(nc)'s maintenance of fringe benefits and provision of minimum salary increases. Although REA would like to read into § 111.70(4)(cm)5s what the legislature intended for the investigator to consider, we are satisfied that § 111.70(1)(nc) and WIS. ADMIN. CODE § ERC 33.10(3) adequately address this. Accordingly, we are not persuaded by REA's reliance on this provision.

¶ 42. REA also relies on WIS. STAT. § 111.70(4)(cm)8p. This provision states that no collective bargaining agreement can alter the previously agreed-upon salary range structure,

> except that if the cost of funding the attainment of a step is greater than the amount required for the municipal employer to submit a qualified economic offer, the agreement may contain a provision altering the requirements for attaining a step to no greater extent than is required for the municipal employer to submit a qualified economic offer at the minimum possible cost to the municipal employer.

*Id.* In other words, if the cost of funding an entire step exceeds the maximum allowable percentage under

§ 111.70(1)(nc)1.b, then the new collective bargaining agreement may include a provision altering the requirements for attaining a step as directed above. REA contends that because § 111.70(4)(cm)8p uses the term "amount" in connection with a QEO, the legislature intended that cost calculations for a QEO be accurate as a precondition to QEO existence.

¶ 43. While we agree that "amounts" and costs are associated with a QEO, these amounts are presented under WERC's Forms A and B. As we have determined, the adequacy of the forms is not a requirement for QEO existence. REA's position is not saved by WIS. STAT. § 111.70(4)(cm)8p.

¶ 44. Finally, REA draws from selected legislative history to support its position that a QEO was intended to be an amount based on specified costs calculations. The use of such history, however, is unnecessary and, moreover, prohibited when the meaning of a statute is clear from the language. *See Lake City Corp. v. City of Mequon*, 207 Wis. 2d 155, 162–63, 558 N.W.2d 100 (1997). We are satisfied that the statute, while complex, evinces the legislature's intent.

■■

¶ 45. In sum, given our standard and scope of review, we conclude that WERC's conclusion that the District submitted a QEO pursuant to WIS. STAT. § 111.70(1)(nc) and WIS. ADMIN. CODE § ERC 33.10(3) was a reasonable interpretation of the law that comports with the law's purpose. Because REA does not provide a more compelling interpretation, we uphold WERC's decision. *See UFE*, 201 Wis. 2d at 286–87.

## B. QEO Errors

¶ 46. Although WERC corrected problems in the District's QEO calculations, REA contends that further errors remain. Because we have already determined that a QEO exists, the specific points of error REA raises go only to WERC's implementation of the QEO and do not, as REA contends, put into question the existence of the QEO.

### 1. Salary Increase Minimum

¶ 47. The first of these errors involves REA's belief that a QEO cannot increase employees' salaries by more than the amounts specified in WIS. STAT. § 111.70(1)(nc). REA argues that WERC was wrong in relying solely upon language in § 111.70(1)(nc) that indicates that salary increases shall be "at least" at stated levels. Because this issue is novel to WERC, we review WERC's determinations de novo. *See UFE*, 201 Wis. 2d at 285.

¶ 48. We concur with WERC and the District that, standing alone, WIS. STAT. § 111.70(1)(nc)'s salary increase structure permits a QEO to exceed the amounts specified in the statute. The language is plain that the words "at least" set only a minimum salary increase level. Section 111.70(1)(nc)1.b states that a QEO is to include a proposal to offer "a salary increase of *at least* one full step," and subp. (c) provides that the employer must offer an average salary increase "*at least* equivalent to an average cost of 2.1% of the total compensation and fringe benefit costs." (Emphasis added.) The "at least" language is used three other times in subps. (b) and (c). We see no ambiguity here.

¶ 49. REA, however, argues that the words "at least" in WIS. STAT. § 111.70(1)(nc) are ambiguous

because they conflict with other MERA provisions. REA looks to § 111.70(4)(cm)8p which directs that the only time a salary schedule can be modified for professional school employees is (1) by mutual agreement of the parties, or (2) if the cost of funding a step is greater than the amount required for a municipal employer to submit a QEO. In the latter case, the requirements for attaining a step may be altered no more than is necessary for the employer to submit a QEO "at the minimum possible cost to the municipal employer." Section 111.70(4)(cm)8p.[14]

■

¶ 50.   If the plain language of a statute is ambiguous, we turn to extrinsic aids such as the legislative history, scope, context and purpose of the statute to determine legislative intent. *See German v. DOT*, 223 Wis. 2d 525, 536–37, 589 N.W.2d 651 (Ct. App. 1998), *aff'd*, 2000 WI 62, 235 Wis. 2d 576, 612 N.W.2d 50. In construing multiple statutes, we must harmonize them, if possible, and read them together in a way that will give each full force and effect. *See id.* at 537. "Statutes dealing with the same subject as the one being construed are commonly referred to as statutes in pari materia which, as with other forms of extrinsic aids, should be resorted to only if the statute being examined is ambiguous." *National Exch. Bank v. Mann*, 81 Wis. 2d 352, 361, 260 N.W.2d 716 (1978).

---

[14] The District contends that the phrase "at the minimum possible cost to the municipal employer" should not be considered because it did not appear in the 1993 version. The District's concern is baseless, however, because this language became effective on May 6, 1994, *see* 1993 Wis. Act 429, § 3, while the District's QEO was submitted over a year later on September 26, 1995.

Statutes in pari materia, although in apparent con-
flict, are so far as reasonably possible construed to
be in harmony with each other. But if there is an
irreconcilable conflict between the new provision
and the prior statutes relating to the same subject
matter, the new provision will control as it is the
later expression of the legislature.

*Id.* (quoting 2A SUTHERLAND, STATUTORY CONSTRUCTION
§ 51.02 at 290 (4th ed. 1973)).

¶ 51. We agree with REA that this language con-
flicts with WIS. STAT. § 111.70(1)(nc)1. On the one hand,
the words "at least" within § 111.70(1)(nc)1.b and c set
forth only the minimum threshold for salary increases.
On the other hand, § 111.70(4)(cm)8p states that any
modification in a salary schedule can only occur at a
minimum cost to the employer. Therefore, if an
employer wished to offer a salary increase above 2.1%
consistent with § 111.70(1)(nc)1.c, such a raise would
exceed the minimum level of costs to the employer con-
trary to § 111.70(4)(cm)8p. We find these two
provisions to be ambiguous.

¶ 52. In resolving the ambiguity, we first look to
a document from the Legislative Fiscal Bureau that
addresses the purpose of the QEO law. Reports pre-
pared by the Legislative Fiscal Bureau are " 'official
report[s] of a legislatively created committee' and are
'clearly valid evidence of legislative intent.' " *Juneau
County v. Courthouse Employees*, 221 Wis. 2d 630, 647,
585 N.W.2d 587 (1998) (quoting *Ball v. District No. 4*,
117 Wis. 2d 529, 543, 345 N.W.2d 389 (1984)). The
Legislative Fiscal Bureau addressed a number of
issues in question and answer format, the first of which
was:

64

**How will the new mediation-arbitration changes work?**

The basic thrust of the changes is to establish for a limited period of time . . . a set of salary increase and fringe benefits increase *thresholds*. If a municipal employer subject to these new provisions makes a salary and wage offer to municipal employes subject to these provisions that at least meets these *threshold levels*, then the salary and fringe benefits components of any pending bargaining impasse would not be allowed to be submitted to arbitration.

Legislative Fiscal Bureau, *Questions and Answers Regarding Limits on School District Revenues and School Personnel Compensation Increases Created by 1993 Act 16*, at Part 1, p.1 (Aug. 30, 1993) (emphasis added). The term "thresholds," therefore, like the words "at least," establishes a minimum which by its ordinary usage permits an increase above the stated level.

¶ 53. After WIS. STAT. § 111.70(1)(nc)1 was enacted, however, the legislature added the phrase "at the minimum possible cost to the municipal employer" to § 111.70(4)(cm)8p. *See* 1993 Wis. Act 429, § 3 (eff. May 6, 1994). The drafting records to 1993 Wis. Act 429, § 3 do not address the thresholds under § 111.70(1)(nc)1, but they do clearly establish that the legislature intended to limit any salary increases to the least possible cost to the employer.[15]

---

[15] The analysis provided by the Legislative Reference Bureau simply reiterates what appears in the statute:

In collective bargaining agreements covering school district professional employes, prior to July 1, 1996, the parties must maintain the salary range structure, the number of steps and the requirements for attaining a step and for assigning a position to a salary range, except that if the cost of funding the attainment of a

¶ 54. Because the amendment to WIS. STAT. § 111.70(4)(cm)8p followed the enactment of § 111.70(1)(nc)1 and, we believe, presents an "irreconcilable conflict" with § 111.70(1)(nc)1's prescription of minimum thresholds, we are in agreement with REA. Consistent with recognized rules of statutory construction, § 111.70(4)(cm)8p "prevails as the latest expression of legislative will." *See* 2B NORMAN J. SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 51.02 at 122 (5th ed. 1992). As such, we read § 111.70(4)(cm)8p as eliminating the "at least" terminology from § 111.70(1)(nc)1. Therefore, instead of providing a salary increase of "at least one full step" and an average salary increase "at least equivalent to an average cost of 2.1%," § 111.70(1)(nc)1 is limited to a salary increase simply of "one full step" and an average salary increase "equivalent to an average cost of 2.1%." Section 111.70(1)(nc)1.b, c. Anything more would necessarily increase the employer's costs.

## 2. Premium Equivalents

¶ 55. The District self-insures the health and dental care benefits it provides employees, and the insurance costs for such benefits are factored into its QEO. The District used "premium equivalents" to make its insurance cost calculations for its QEO rather than using actual costs for the base year. A "premium

---

step is greater than the amount required for the employer to submit a qualified economic offer, the parties may alter the requirements for attaining a step to no greater extent than is required for the employer to submit a qualified economic offer. *The bill clarifies that this means a qualified economic offer at the minimum possible cost to the employer.*

Legislative Reference Bureau Analysis, 1993 S.B. 547 (LRB–4677/1) (emphasis added).

equivalent" is an accounting technique used to estimate actual costs. REA complains that the use of the premium equivalents was improper and that at the time the District calculated its QEO fringe benefit costs in 1995, the District "either knew or should have known" the precise dollar amount for all benefits it paid bargaining unit members during the 1992–93 QEO base year. REA argues that instead of using the actual costs, the District inappropriately relied upon "guesstimates."

¶ 56. WERC has previously dealt with the use of premium equivalents by a self-insured employer in *LaCrosse Education Ass'n*, Dec. No. 28462 (WERC Nov. 7, 1995). WERC's review of premium equivalents, however, is not one of long standing; therefore, we give WERC's decision only due weight deference. *See UFE*, 201 Wis. 2d at 284–86.

¶ 57. Under the QEO law, no references are made to premium equivalents, just "costs" and "benefits." *See* WIS. STAT. § 111.70(1)(nc)1.a, (4)(cm)8p, (4)(cm)8s. Under § 111.70(4)(cm)8s, WERC is called upon to "prescribe forms for calculating the total increased cost to the municipal employer of compensation and fringe benefits. . . . The cost shall be determined based upon the total cost of compensation and fringe benefits provided to school district professional employes . . . on the 90th day before expiration of any previous collective bargaining agreement between the parties . . . ." The statute does not further define how such costs and benefits are to be determined. Similarly, within Forms A and B, WERC does not detail specifically how costs are to be figured.

¶ 58. In its decision, WERC concluded that its ruling in *LaCrosse Education* generally permits the use of premium equivalents for determining QEO

costs. There, WERC addressed whether a school district's health insurance premium cost increases understated the cost of maintaining self-insured health benefits. WERC stated:

> As a general matter, we are persuaded that neither Sec. 111.70(1)(nc)1.a, Stats., nor Sec. 111.70(4)(cm)8s, Stats., envision that the Commission would evaluate whether the level of health insurance premium cost increase or decrease (as opposed to the employer's percentage contribution toward said cost) was appropriate when determining the composition of a qualified economic offer. Thus, neither the text nor calculation forms of our administrative rules adopted pursuant to Sec. 111.70(4)(cm)8s, Stats., make any reference to such an inquiry. Therefore, we generally conclude that, for instance, when health insurance benefits are obtained through a private provider and that provider raises premiums by a certain percentage, we have no role to play in evaluating the propriety of that level of premium increase.
>
> The Association does not necessarily disagree with the foregoing as it relates to private providers but argues that where the employer itself is the entity that establishes the premium levels, the risk of inappropriate premium level manipulation is so great that the Commission should evaluate the level of premium increase against some objective standards. We concede the potential for abuse argued by the Association, although we believe this potential exists in both the private carrier and self-insurance arenas. However, as noted above, *we do not believe the Legislature intended to empower us to evaluate the propriety of premium levels and in effect establish premium levels ourselves for the purposes of a qualified economic offer.* Instead, we believe it was the Legislature's intent that collec-

tive bargaining over the identity of the insurance provider, the benefits to be received and the employe cost of those benefits would serve as a sufficient check on any abuses which might occur. (Emphasis added.)

¶ 59. We concur with WERC's comments in *LaCrosse Education.* Just as WIS. STAT. § 111.70(1)(nc)1.a and (4)(cm)8s do not address the appropriateness of insurance premium cost increases and decreases, neither statute dictates what accounting methods are to be used for determining such costs. These concerns are left to the collective bargaining process to sort out. The legislature gives no indication that it intended for WERC to scrutinize the particular accounting methods adopted by the employer in determining such costs as insurance premiums. In this case, we do not believe such detail was meant to fall under WERC's purview. We find compelling WERC's comments that, as is the case with health insurance benefits obtained through a private provider, WERC plays no part in analyzing the accounting methods used by an employer in establishing its own insurance premiums. We conclude that WERC's decision was reasonable.

### 3. Workers' Compensation Benefits

¶ 60. REA contends that $312,000 in workers' compensation benefits should have been included in the District's QEO fringe benefit calculations. This issue is one of first impression for WERC and, thus, our review is de novo. *See UFE*, 201 Wis. 2d at 285.

¶ 61. In ruling against REA, WERC found that although fringe benefit costs in WIS. STAT. § 111.70(1)(nc)1.a "could be interpreted in a manner which would include worker's compensation costs,"

such costs are "not typically recognized and considered a part of the bargaining process or when costing of the settlement [is] ultimately reached." WERC further noted that when it underwent the rule-making process, "no unions or employers asked that this cost be included, which reaffirmed our view of the historical context."

¶ 62. In support of its position, REA cites to a case addressing the scope of fringe benefits as used in WIS. STAT. § 978.12 pertaining to salaries and benefits of state employees of a district attorney's office. *See Brown County Attorneys Ass'n v. Brown County*, 169 Wis. 2d 737, 740, 487 N.W.2d 312 (Ct. App. 1992). In *Brown County Attorneys*, the term "fringe benefit" was not defined by statute; therefore, we looked to its ordinary and accepted meaning. *See id.*

> *Webster's Third New Int'l Dictionary* 912 (Unabr. 1976), defines "fringe benefit" as: "[A]n employment benefit. . .granted by an employer that involves a money cost without affecting basic wage rates." All fringe benefits, as a benefit to the employee at a money cost to the employer, are essentially "compensation" for work done. The question, consequently, is not whether the benefit is compensation, but, rather, whether it is compensation that affects basic wage rates.

*Id.* at 742–43.

¶ 63. The District responds that *Brown County Attorneys* does not control because it does not specifically state whether workers' compensation benefits are themselves considered a fringe benefit. The District, instead, looks to an administrative code provision for the Law Enforcement Standards Board where fringe benefits are defined as "benefits paid to or on behalf of

an officer above his or her hourly rate or salary and not required by law to be paid. Items excluded from fringe benefits shall include, but not be limited to, . . . workers compensation premiums . . . ." WIS. ADMIN. CODE § LES 1.03(13).

¶ 64. Our review of WIS. STAT. § 111.70(1)(nc)1 and WIS. ADMIN. CODE § ERC 33.10 reveals no mention of workers' compensation costs. As WERC has been authorized to create forms for calculating the costs associated with fringe benefits, it has the discretion to determine what qualifies as a fringe benefit. WERC's Form B includes such items as social security, retirement and health, dental, vision, life, disability and long-term insurance costs. *See* § ERC 33.10 app.

¶ 65. REA would have us rewrite WERC's Form B to include workers' compensation costs. To do this, however, we would effectively be changing WERC's policy despite it having properly followed the rule-making process in creating WIS. ADMIN. CODE § ERC 33.10 and Form B. *See* WIS. STAT. § 227.11(2). It is one thing to decide whether WERC has properly followed statutory laws and agency rules, *see* WIS. STAT. § 227.57(5), while quite another to determine whether WERC's rules and forms are in and of themselves sufficient. As each party's position purports to show, there is support both for including and excluding workers' compensation benefits as fringe benefit costs. However, because our review is limited to whether WERC has properly followed the law, and not to whether WERC's rules and forms are prudent, we only review whether WERC has erroneously interpreted the law. In this case, it has not. Thus, we reject REA's request.

## 4. Other Cost Components

¶ 66. Finally, REA seeks review of the District's inclusion of stop-loss insurance costs, medical management service costs and an inflation factor within its fringe benefit calculations. REA argues that such items provide no benefit to the employee and therefore should not be included. We disagree.

¶ 67. WERC offered the following response to REA's complaints.

> [As to stop-loss insurance costs], *LaCrosse [Education]* again provides guidance. If a private carrier included these components when determining the premium it would charge, we would not evaluate the propriety of the components for the purposes of QEO calculations. We reiterate that we find no basis for treating premium equivalencies in a different manner. We would also note that these components are rationally related to the cost of providing health and dental benefits.
>
> In addition, [REA] objects to inclusion of "medical management" costs as a fringe benefit cost. The record establishes that the District's participation in MEI, Inc. gives the District generally, and Association-represented employes specifically, access to provider networks which discount their fees for providing contractually-bargained health benefits. In our opinion, this "medical management" cost is directly related to the cost of providing "fringe benefits" and thus is properly included.

¶ 68. WERC explains that the stop-loss insurance and medical management costs are directly and rationally related to the cost of providing the health and dental benefits. In addition, the District points out that as to stop-loss insurance, insuring against catastrophic risks is a necessary part of providing health

insurance benefits to employees. Companies that do not underwrite their own losses will likely obtain stop-loss insurance from another carrier. As to the medical management costs, such costs are vital to the District's self-funded health insurance plan and, in fact, have resulted in the District saving over $2,500,000 in costs from 1991 to 1995. Further, the District explains that the inflation factor is a necessary way in which to predict future administrative costs.

¶ 69. We agree with WERC and the District. These additional costs are part and parcel of the fringe benefits the employee receives and are appropriately included as costs. We therefore reject REA's arguments to the contrary.

## CONCLUSION

¶ 70. We uphold the distinction made by WERC between QEO existence and implementation, and conclude that errors within a QEO should not render it invalid. In this case, the District offered REA a valid QEO. The QEO, however, contains an error regarding the minimum salary increase proposed by the District. WISCONSIN STAT. § 111.70(4)(cm)8p requires that any salary increase presented by a QEO be at a minimum cost to the employer. Accordingly, we reverse on this point of error and remand to the circuit court with instructions to further remand to WERC to correct the District's QEO so that any proposed salary increase is at the minimum levels under § 111.70(1)(nc). We affirm the remainder of WERC's decision.

*By the Court.*—Order affirmed in part; reversed in part and cause remanded with directions.