DODGELAND EDUCATION ASSOCIATION, Petitioner-
Appellant-Petitioner,

v.

WISCONSIN EMPLOYMENT RELATIONS COMMISSION and
Dodgeland School District, Respondents-
Respondents.

Supreme Court

*No. 00–0277. Oral argument October 2, 2001.—Decided
February 28, 2002.*

2002 WI 22

(Also reported in 639 N.W.2d 733.)

For the petitioner-appellant-petitioner there were briefs by *Melissa A. Cherney, Chris Galinat, Bruce Meredith* and *Wisconsin Education Association Council,* Madison, and oral argument by *Melissa A. Cherney.*

For the respondent-respondent, Wisconsin Employment Relations Commission, the cause was argued by *William H. Ramsey,* assistant attorney general, with whom on the brief was *James E. Doyle,* attorney general.

For the respondent-respondent, Dodgeland School District, there was a brief by *Kirk D. Strang* and *Lathrop & Clark LLP,* Madison, and oral argument by *Kirk D. Strang.*

An amicus curiae brief was filed by *Jack D. Walker, Douglas E. Witte* and *Melli, Walker, Pease & Ruhly, S.C.,* Madison, and there was oral argument by *Jack D. Walker,* on behalf of the Wisconsin Association of School Boards.

¶ 1. N. PATRICK CROOKS, J. Dodgeland Education Association (Association) appeals from an order

affirming a Wisconsin Employment Relations Commission (WERC) decision finding that an item, such as the teacher preparation time memorandum, must be a mandatory subject of bargaining in order to be a "fringe benefit" within the meaning of Wis. Stat. § 111.70(1)(nc)1.a. (1997–98),[1] and that teacher preparation time is not a mandatory but rather a permissive subject of bargaining and, therefore, is not a fringe benefit. The Association first argues that teacher preparation time is a mandatory subject of bargaining because it is primarily related to wages, hours and conditions of employment. Second, the Association claims that the Dodgeland School District (District) did not submit a qualified economic offer (QEO) because teacher preparation time is a fringe benefit which must be maintained in order to have a QEO. We conclude that we must afford great weight deference to WERC's decision that teacher preparation time is not a mandatory subject of bargaining, and due weight deference to WERC's interpretation of fringe benefits under § 111.70, and we, therefore, affirm WERC's ruling on both matters.

¶ 2. With regard to WERC's decision that teacher preparation time (hereinafter prep time) is a permissive rather than a mandatory subject of bargaining, we conclude that WERC's decision was reasonable because it employed the "primarily related" balancing test. Affording WERC's decision great weight deference, we affirm WERC's holding because it has a rational basis. We note, however, that we would affirm WERC's decision under the due weight deference standard as well,

---

[1] The relevant portions of Wis. Stat. § 111.70 are quoted and discussed below. All references to the Wisconsin Statutes are to the 1997–98 version unless otherwise noted.

because the Association's view of teacher prep time as a mandatory subject of bargaining is not more reasonable than WERC's decision.

¶ 3. We also find that WERC's decision that an item must be a mandatory subject of bargaining in order to be a fringe benefit under Wis. Stat. § 111.70(1)(a), is reasonable and furthers the purpose of the statute. While the Association's interpretation of fringe benefits is also reasonable, under the due weight deference standard, the Association's interpretation is not more reasonable and we affirm WERC's ruling.

¶ 4. Finally, we affirm WERC's conclusions that the District submitted a valid QEO and that the Association cannot proceed to interest arbitration over the impact proposal. Because teacher prep time is not a fringe benefit under Wis. Stat. § 111.70(1)(a), the District was not required to continue the prep time guarantee, and the District's proposal was a valid QEO. Subsequently, we also affirm WERC's conclusion that the impact proposal is not subject to interest arbitration, because in the presence of a valid QEO neither party can proceed to interest arbitration over economic issues.

I

¶ 5. Before discussing the facts of this case, we briefly review the history of Wis. Stat. § 111.70, the Municipal Employment Relations Act (MERA), and the "qualified economic offer" (QEO) amendments. MERA provides procedures for the collective bargaining process for municipal employers and employees. Since its

inception,[2] MERA has defined collective bargaining, in part, as:

> . . . the performance of the mutual obligation of a municipal employer . . . and the representative of its municipal employes . . . to meet and confer at reasonable times, in good faith, with the intention of reaching an agreement . . . with respect to wages, hours and conditions of employment . . . .

Wis. Stat. § 111.70(1)(a). The definition of collective bargaining also specifically distinguishes matters subject to bargaining from those that are not.

> . . . The municipal employer shall not be required to bargain on subjects reserved to management and direction of the governmental unit except insofar as the manner of exercise of such functions affects the wages, hours and conditions of employment of the municipal employes in a collective bargaining unit. . . .

*Id.*

¶ 6. This court has acknowledged that conflict over whether certain matters are subject to bargaining is inevitable because a matter involving wages, hours, and conditions of employment may also relate to public policy. *Beloit Educ. Ass'n v. WERC*, 73 Wis. 2d 43, 52–53, 242 N.W.2d 231 (1976). The "primarily related" test was adopted to resolve such conflict. *Id.* at 54. "The question is whether a particular decision is primarily related to the wages, hours and conditions of employment of the employees, or whether it is primarily related to the formulation or management of public policy." *Unified Sch. Dist. No. 1 v. WERC*, 81 Wis. 2d 89,

---

[2] The Municipal Employment Relations Act was originally enacted as Chapter 178, Laws of 1977.

102, 259 N.W.2d 724 (1977). Accordingly, we have consistently applied the "primarily related" standard as a balancing test:

> If the employees' legitimate interest in wages, hours, and conditions of employment outweighs the employer's concerns about the restriction on managerial prerogatives or public policy, the proposal is a mandatory subject of bargaining. In contrast, where the management and direction of the school system or the formulation of public policy predominates, the matter is not a mandatory subject of bargaining.

*West Bend Educ. Ass'n v. WERC,* 121 Wis. 2d 1, 9, 357 N.W.2d 534 (1984).

¶ 7. Prior to the 1993 amendments, if the parties to a municipal employment collective bargaining agreement "are deadlocked with respect to any dispute . . . over wages, hours and conditions of employment . . . either party, or the parties jointly, may petition the commission . . . to initiate compulsory, final and binding arbitration . . ." Wis. Stat. § 111.70(4)(cm)6. This "interest arbitration" however, is available only for mandatory subjects of bargaining. *Beloit Educ. Ass'n,* 73 Wis. 2d at 54. To state this another way, interest arbitration is available only for disputes primarily related to wages, hours, and conditions of employment.

¶ 8. In 1993, the legislature amended MERA as it applies to bargaining units "consisting of school district professional employes . . . " *See* Wis. Stat. § 111.70(4)(cm)5s.[3] Under the revised statute, a school

---

[3] We take strong issue with the position advanced by the dissent that this court is eliminating another significant right for teachers by our holding in this case. *See* dissent at ¶ 52. Rather, we are applying the statutory scheme adopted by the

district can submit a "qualified economic offer" (QEO) and subsequently "no economic issues are subject to interest arbitration." *Id.* In order to submit a valid QEO, a municipal employer must submit a proposal providing a statutorily required increase in the cost of wages and fringe benefits and maintain all fringe benefits existing on the 90th day prior to expiration of the previous collective bargaining agreement. *See* Wis. Stat. § 111.70(1)(nc)1.[4] Under § 111.70(4)(cm)5s., ei-

---

Wisconsin legislature to the facts presented in this case. We take no position—for or against—the wisdom of the statutes at issue, since that determination involves, appropriately, the legislative branch of Wisconsin government, and such determination is not for this court. *See Vincent v. Voight,* 2000 WI 93, ¶ 52, 236 Wis. 2d 588, 614 N.W.2d 388. Furthermore, we disagree with the dissent's reliance on the dissenting commissioner's opinion, contending that WERC's holding that fringe benefits do not include permissive subjects of bargaining is contrary to legislative intent. *See* dissent at ¶ 53. We rely on the WERC majority decision that examined the legislative intent and found to the contrary.

> Lastly, we observe that we have no extraneous evidence of a legislative intent to define "fringe benefits" in a way which would include permissive subjects of bargaining. If the legislature had intended that the *quid pro quo* for use of the qualified economic offer was the loss of employer control over matters primarily related to educational policy, such a significant concept would surely have found its way into the evidence of legislative history . . . which is part of the record in this case.

*Dodgeland Sch. Dist.,* Dec. No. 29490, 23 (WERC, 1/99).

[4] Wisconsin Stat. § 111.70(1)(nc)1 states the complete definition of a QEO and provides in full:

(nc) 1. "Qualified economic offer" means an offer made to a labor organization by a municipal employer that includes all of the following, except as provided in subd. 2.:

a. A proposal to maintain the percentage contribution by the municipal employer to the municipal employes' existing fringe benefit costs as determined under sub. (4)(cm)8s., and to maintain all fringe benefits provided to the municipal employes in a collective bargaining unit, as such contributions and benefits existed on the 90th day prior to expiration of any previous collective bargaining agreement between the parties, or the 90th day prior to commencement of negotiations if there is no previous collective bargaining agreement between the parties.

b. In any collective bargaining unit in which the municipal employe positions were on August 12, 1993, assigned to salary ranges with steps that determine the levels of progression within each salary range during a 12–month period, a proposal to provide for a salary increase of at least one full step for each 12–month period covered by the proposed collective bargaining agreement, beginning with the expiration date of any previous collective bargaining agreement, for each municipal employe who is eligible for a within range salary increase, unless the increased cost of providing such a salary increase, as determined under sub. (4)(cm)8s., exceeds 2.1% of the total compensation and fringe benefit costs for all municipal employes in the collective bargaining unit for any 12–month period covered by the proposed collective bargaining agreement plus any fringe benefit savings, or unless the increased cost required to maintain the percentage contribution by the municipal employer to the municipal employes' existing fringe benefit costs and to maintain all fringe benefits provided to the municipal employes, as determined under sub. (4)(cm)8s., in addition to the increased cost of providing such a salary increase, exceeds 3.8% of the total compensation and fringe benefit costs for all municipal employes in the collective bargaining unit for any 12–month period covered by the proposed collective bargaining agreement, in which case the offer shall include provision for a salary increase for each such municipal employe in an amount at least equivalent to that portion of a step for each such 12–month period that can be funded after the increased cost in excess of

368

2.1% of the total compensation and fringe benefit costs for all municipal employes in the collective bargaining unit plus any fringe benefit savings is subtracted, or in an amount equivalent to that portion of a step for each such 12–month period that can be funded from the amount that remains, if any, after the increased cost of such maintenance exceeding 1.7% of the total compensation and fringe benefit costs for all municipal employes in the collective bargaining unit for each 12–month period is subtracted on a prorated basis, whichever is the lower amount.

c. A proposal to provide for an average salary increase for each 12–month period covered by the proposed collective bargaining agreement, beginning with the expiration date of any previous collective bargaining agreement, for the municipal employes in the collective bargaining unit at least equivalent to an average cost of 2.1% of the total compensation and fringe benefit costs for all municipal employes in the collective bargaining unit for each 12–month period covered by the proposed collective bargaining agreement plus any fringe benefit savings, beginning with the expiration date of any previous collective bargaining agreement, including that percentage required to provide for any step increase and any increase due to a promotion or the attainment of increased professional qualifications, as determined under sub. (4)(cm)8s., unless the increased cost of providing such a salary increase, as determined under sub. (4)(cm)8s., exceeds 2.1% of the total compensation and fringe benefit costs for all municipal employes in the collective bargaining unit for any 12–month period covered by the proposed collective bargaining agreement plus any fringe benefit savings, or unless the increased cost required to maintain the percentage contribution by the municipal employer to the municipal employes' existing fringe benefit costs and to maintain all fringe benefits provided to the municipal employes, as determined under sub. (4)(cm)8s., in addition to the increased cost of providing such a salary increase, exceeds 3.8% of the total compensation and fringe benefit costs for all municipal employes in the collective bargaining unit for any 12–month period covered by the collective bargaining agreement, in which

valid QEO, which would preclude compulsory interest arbitration of economic issues.[5]

## II

¶ 9. The facts of this case are not in dispute. The Dodgeland Education Association (Association) is the collective bargaining representative of teachers employed by the Dodgeland School District (District). During the period of the 1995–1997 collective bargain-

case the offer shall include provision for a salary increase for each such period for the municipal employes covered by the agreement at least equivalent to an average of that percentage, if any, for each such period of the prorated portion of 2.1% of the total compensation and fringe benefit costs for all municipal employes in the collective bargaining unit plus any fringe benefit savings that remains, if any, after the increased cost of such maintenance exceeding 1.7% of the total compensation and fringe benefit costs for all municipal employes in the collective bargaining unit for each 12–month period and the cost of a salary increase of at least one full step for each municipal employe in the collective bargaining unit who is eligible for a within range salary increase for each 12–month period is subtracted from that total cost.

[5] Wisconsin Stat. § 111.70(1)(dm) defines economic issues and states in full:

> (dm) "Economic issue" means any issue that creates a new or increased financial liability upon the municipal employer, including salaries, overtime pay, sick leave, payments in lieu of sick leave usage, vacations, clothing allowances in excess of the actual cost of clothing, length-of-service credit, continuing education credit, shift premium pay, longevity pay, extra duty pay, performance bonuses, health insurance, life insurance, vacation pay, holiday pay, lead worker pay, temporary assignment pay, retirement contributions, severance or other separation pay, hazardous duty pay, certification or license payment, job security provisions, limitations on layoffs and contracting or subcontracting of work that would otherwise be performed by municipal employes in the collective bargaining unit with which there is a labor dispute.

ing agreement, the District and the Association had a memorandum of understanding (memorandum) setting forth the minimum prep time that would be available to teachers in the school district. The memorandum guaranteed that, "absent mutual agreement by the parties to modify the number of preparation periods," middle school and high school teachers were to have two prep periods per day, and elementary teachers were to have them during art, music, and physical education classes and at lunch. The prep time memorandum expired on June 30, 1997.

¶ 10. Prep time is a period when a teacher does not have assigned teaching responsibility. WERC found that it was the general expectation and practice for teachers to use that time for preparation activities, including lesson planning, meeting with students, grading schoolwork, making phone calls to parents, maintaining student records, ordering supplies, and other activities related to teaching. *Dodgeland Sch. Dist.*, Dec. No. 29490, 5–8 (1/99). The teacher may also use that time as a break if he or she chooses to accomplish preparation tasks at times other than prep time. *Id.*

¶ 11. In the spring of 1997, the parties began negotiating a successor collective bargaining agreement. The Association proposed a continuation of the prep time guarantee, as reflected in the memorandum. The District's proposal did not renew or continue the prep time memorandum guarantee. In a letter dated April 25, 1997, District Superintendent Terry McLeod advised teachers that although he did "understand the importance of adequate prep time and would not support action to unnecessarily reduce such a valuable resource," the "financial picture for the District is not very bright," and "it may be necessary for everyone to make concessions." On December 22, 1997, McLeod

sent a letter to Bob Sweeney, President of the Association. The letter stated, "the District hereby disavows any alleged past practice relating to guaranteed teacher prep time" and it was "the District's intention to discontinue the alleged teacher prep time past practice commencing with the next semester."

¶ 12. The District and the Association were unable to reach agreement on a 1997–1999 collective bargaining agreement. The District submitted a salary offer, intending to meet the requirements of a QEO under Wis. Stat. § 111.70(1)(nc)1.a. The District then filed a petition with the Wisconsin Employment Relations Commission (WERC) for a declaratory ruling that its offer comported with the requirements of the QEO law, that the provisions of the prep time memorandum did not constitute a fringe benefit or economic issue under the QEO law, and that the Association could not proceed to interest arbitration over continuation of the memorandum.[6] In proceedings before WERC, the Association submitted an impact proposal, stating that if the District "chooses to establish a schedule for a teacher which includes less preparation time" than that set forth in the previous prep time memorandum, then the teacher would be compensated as "work overload" based on a formula related to his or her regular teaching salary.

---

[6] The District sought the declaratory ruling under Wis. Stat. §§ 111.70(4)(b), 111.70(4)(cm)5s., 111.70(4)(cm)6.g. and 227.41.

¶ 13. In a split decision,[7] WERC concluded: (1) the prep time memorandum is a permissive subject of bargaining; (2) the prep time memorandum is neither an "economic" nor a "noneconomic" issue within the meaning of Wis. Stat. § 111.70(1)(dm) and (4)(cm)5s; (3) because the prep time memorandum is a permissive subject of bargaining, prep time is not a "fringe benefit" within the meaning of § 111.70(1)(nc)1.a.; (4) the Association's impact proposal is a mandatory subject of bargaining and an "economic issue" within the meaning of § 111.70(1)(dm); and (5) the District's proposal is a QEO within the meaning of § 111.70(1)(nc)1. Based on these conclusions of law, WERC issued a declaratory ruling: (1) the District does not have a duty to bargain over the inclusion of the prep time memorandum; (2) the District does have a duty to bargain over inclusion of the Association's impact proposal; (3) because the Association proposal to continue the prep time memorandum is not an economic issue or a noneconomic issue, the Association cannot utilize interest arbitration to seek inclusion of the prep time memorandum; and (4) because the District has made a QEO and because the Association's *impact proposal* (asking for compensation for work overload) is an economic issue, the Association cannot utilize interest arbitration to seek inclusion of the impact proposal.

---

[7] Commissioner Hempe dissented. He found that prep time is a fringe benefit and, therefore, under Wis. Stat. § 111.70(1)(nc)1.a., the District did not make a valid QEO. He further emphasized that the majority's distinction between permissive and mandatory subjects of bargaining is unnecessary because § 111.70(1)(nc)1.a. requires continued maintenance of all fringe benefits, not just mandatory fringe benefits.

¶ 14. In finding that the prep time memorandum is a permissive subject of bargaining, WERC relied on previous WERC decisions and employed the "primarily related" balancing test. WERC found that prep time is primarily related to educational policy rather than wages, hours, and conditions of employment.

¶ 15. WERC also held that prep time is not a fringe benefit. Because "fringe benefit" is not defined in MERA or elsewhere in the statutes, WERC gave the term its ordinary and accepted meaning based on dictionary definitions. WERC concluded that while prep time could be viewed as non-wage or indirect compensation, the dictionary examples and previous WERC decisions are persuasive that fringe benefits do not include permissive subjects of bargaining. The prep time memorandum, therefore, is not a fringe benefit. Consequently, WERC held that the District is not required to maintain the prep time memorandum as part of its QEO.

¶ 16. Finally, WERC concluded that the Association's impact proposal (asking for compensation for work overload) is an economic issue which cannot proceed to arbitration. Under Wis. Stat. § 111.70(4)(cm)5s., if a QEO exists, neither party can proceed to interest arbitration over "economic issues." The Association's proposal is an economic issue under § 111.70(1)(dm) because it implicates teachers' salaries. Accordingly, because of the valid QEO, WERC concluded that the Association could not proceed to interest arbitration on the impact proposal.

¶ 17. The Dodge County Circuit Court affirmed WERC's decision. The circuit court afforded the decision due weight deference because, while the determination of a fringe benefit under the QEO amendments is a relatively new issue, WERC has considerable expe-

rience dealing with prep time and determining mandatory and permissive subjects of bargaining. After examining the Association's interpretation of the QEO amendments, the court concluded that WERC's decision furthers the purpose of the QEO amendments and there is no more reasonable interpretation of the law than that made by the agency.

¶ 18. The Association appealed and the court of appeals affirmed WERC's decision. *Dodgeland Educ. Ass'n v. WERC*, 2000 WI App 260, 240 Wis. 2d 287, 623 N.W.2d 159. Applying the due weight standard of review, the court of appeals held that WERC's decision that the teacher prep time memorandum is not a fringe benefit is "reasonable" and "rationally based on the historical treatment of fringe benefits as mandatory subjects of bargaining." *Id.* at ¶ 20. Because the Association's interpretation of fringe benefit was not more reasonable, WERC's conclusion was affirmed. *Id.* at ¶ 24. With regard to whether prep time is a mandatory or permissive subject of bargaining, the court of appeals applied great weight deference to WERC's decision. The court of appeals affirmed WERC's conclusion that the teacher prep time memorandum is a permissive subject of bargaining because WERC's decision was reasonable. *Id.* at ¶¶ 31–32.

¶ 19. The Association filed a petition for review, which this court granted.

III

¶ 20. As an appellate court, we review WERC's decision, but we benefit from the analyses by the circuit court and the court of appeals. *See Racine Educ. Ass'n v. WERC*, 2000 WI App 149, ¶ 16, 238 Wis. 2d 33, 616

N.W.2d 504, *review denied,* 2000 WI 121, 239 Wis. 2d 309, 619 N.W.2d 92. In this case, we review WERC's decision on both issues: (1) whether the teacher prep time memorandum is a mandatory or permissive subject of bargaining, and (2) whether the teacher prep time memorandum is a fringe benefit under Wis. Stat. § 111.70(1)(nc)1.a.[8] Both issues require that we interpret provisions of § 111.70.

¶ 21. The ultimate goal of statutory interpretation is to determine the intent of the legislature. *Racine Educ. Ass'n,* 2000 WI App 149, ¶ 15. We first look to the language of the statute. *See UFE Inc. v. LIRC,* 201 Wis. 2d 274, 281, 548 N.W.2d 57 (1996). If the plain meaning of the statute is clear, we simply apply the clear meaning of the statute to the facts of the case. *Id.* If the statute is ambiguous, however, we must examine the scope, history, context, subject matter and purpose of the statute. *Id.* at 282. If an administrative agency has been charged with the statute's enforcement, we may also look to the agency's interpretation. *Racine Educ. Ass'n,* 2000 WI App 149, ¶ 15.

¶ 22. Whether WERC properly interpreted Wis. Stat. § 111.70 is a question of law and we are not bound by WERC's interpretation. *See Harnischfeger Corp. v. LIRC,* 196 Wis. 2d 650, 659, 539 N.W.2d 98 (1995). In certain circumstances, however, courts should defer to an administrative agency's interpretation of a statute. *Id.* If the agency's "experience, technical competence, and specialized knowledge aid the agency in its inter-

---

[8] We do not review number three of WERC's Declaratory Ruling because the parties, in their briefs before this court, did not address the issue.

pretation and application of the statute, the agency's conclusions are entitled to deference by the court." *West Bend,* 121 Wis. 2d at 12. This court has generally applied three levels of deference to conclusions of law in agency decisions. *Jicha v. DILHR,* 169 Wis. 2d 284, 290, 485 N.W.2d 256 (1992).

> First, if the administrative agency's experience, technical competence, and specialized knowledge aid the agency in its interpretation and application of the statute, the agency determination is entitled to "great weight." The second level of review provides that if the agency decision is "very nearly" one of first impression it is entitled to "due weight" or "great bearing." The lowest level of review, the *de novo* standard, is applied where it is clear from the lack of agency precedent that the case is one of first impression for the agency and the agency lacks special expertise or experience in determining the question presented.

*Id.* at 290–91 (citations omitted). Because this case involves two principal issues, although interrelated, and because the parties dispute what standard of review is to be applied for both, we review each issue in turn.

## IV

¶ 23. We first turn to whether WERC correctly decided that teacher prep time is a permissive subject of bargaining. The Association contends that the teacher prep time memorandum is a mandatory subject of bargaining because it is analogous to employee break time and is primarily related to wages, hours, and conditions of employment.

¶ 24. The parties dispute what level of deference we should afford WERC's decision. The Association

argues that in making its decision, WERC failed to examine how teachers use the prep time, and all of WERC's precedent regarding break periods. If WERC had done this analysis, the Association contends that WERC would have found prep time analogous to a break period, which is a mandatory subject of bargaining. The Association does not directly argue, however, that we should review WERC's decision under any particular standard. Instead, the Association merely takes the position that prep time is analogous to break time. It would appear that the Association is asking this court to afford WERC's decision due weight on the basis that this is not an issue of first impression, nor has WERC established long-standing precedent that prep time is a permissive subject of bargaining.

¶ 25. The District and WERC argue that we should afford WERC's decision great weight deference because the decision meets all four factors to be afforded great weight deference:

> 1) the agency was charged by the legislature with the duty of administering the statute; 2) the interpretation of the agency is one of long-standing; 3) the agency employed its specialized knowledge or expertise in forming the interpretation; and 4) the agency's interpretation will provide consistency and uniformity in the application of the statute.

*MCI Telecomm. Corp. v. State,* 209 Wis. 2d 310, 318, 562 N.W.2d 594 (1997). Specifically, the District and WERC contend: (1) WERC is charged by the legislature with the duty of administering MERA; (2) WERC has consistently held that preparation time is a permissive subject of bargaining; (3) WERC's specialized knowledge and expertise in making these decisions has been recognized by Wisconsin's appellate courts; and (4) WERC's interpretation of mandatory and permissive

378

subjects of bargaining has been uniform and consistent. Based on these four factors, the District and WERC argue we should afford great weight deference to WERC's decision that prep time is a permissive subject of bargaining.

¶ 26. We agree that the great weight standard is appropriate. The first factor is clearly met as the legislature has charged WERC with the duty of administering MERA. WERC's decision also meets the second factor because WERC's interpretation of permissive and mandatory subjects of bargaining is long-standing. WERC first decided that teacher prep time is a permissive subject of bargaining in 1974. *See Oak Creek-Franklin Joint City Sch. Dist. No. 1,* Dec. No. 11827–D (WERC, 9/74). WERC has also decided this specific issue at least twice more, not including the present case. *Racine Unified Sch. Dist.,* Dec. No. 28859–B (WERC, 3/98); *Milwaukee Bd. of Sch. Dir.,* Dec. No. 20093–A (WERC, 2/83). Furthermore, in *Blackhawk Teachers' Federation v. WERC,* 109 Wis. 2d 415, 421–424, 326 N.W.2d 247 (Ct. App. 1982), the court of appeals discussed at length how WERC's administrative experience had evolved since its decision in *Beloit Education Association,* and that WERC's determinations concerning whether provisions are mandatory or permissive subjects of bargaining should be afforded great weight deference. In 1984, this court recognized WERC's expertise in deciding mandatory or permissive subjects of bargaining, even when WERC had no experience on the specific subject of the rule at issue. *Sch. Dist. of Drummond v. WERC,* 121 Wis. 2d 126, 133, 358 N.W.2d 285 (1984) (applying great weight even though the commission had no experience with anti-nepotism rules). "In any case where the commission is asked to determine whether a subject matter is mandatorily or permissibly

379

bargainable, this court will apply the great weight—any rational basis standard to its 'primary relation' conclusion." *Id.*

¶ 27. The only difference between WERC's decision here and WERC's decisions in *Oak Creek, Milwaukee Board,* and *Racine Unified,* is that this case also involves questions regarding the QEO amendments. However, the QEO amendments did not change WERC's long-standing interpretation of what is a permissive or mandatory subject of bargaining. The distinction between permissive and mandatory subjects of bargaining remains the same. WERC's previous decisions that teacher prep time is a permissive subject of bargaining, therefore, establish a long-standing interpretation.

¶ 28. WERC's decision also meets the third and fourth factors, affording the decision great weight deference. In *West Bend Education Association v. WERC,* 121 Wis. 2d 1, 14, 357 N.W.2d 534 (1984), this court recognized WERC's creation of the "primarily related" balancing test and acknowledged WERC's expertise in determining the bargaining nature of proposals. "WERC, in contrast to the courts, has special competence in the area of collective bargaining and has developed significant experience in deciding cases involving the issue of mandatory bargaining." *West Bend,* 121 Wis. 2d at 13 (footnotes omitted). Finally, WERC's decision is afforded great weight deference under the fourth factor because, since the *Oak Creek* decision in 1974, WERC has uniformly and consistently interpreted teacher prep time as a permissive subject of bargaining. *See Racine Unified Sch. Dist.,* Dec. No. 16598 (WERC, 3/98); *Milwaukee Bd. of Sch. Dir.,* Dec. No. 20093–A (WERC, 2/83).

¶ 29. We note, however, that even if we were to afford WERC's decision due weight deference, we would still affirm WERC's decision that teacher prep time is a permissive subject of bargaining. The Association argues that teacher prep time is analogous to an employee break period and WERC has consistently determined that employee break periods are a mandatory subject of bargaining. *See Brown County (Dept. of Soc. Serv.)*, Dec. No. 20623 (WERC, 5/83); *Madison Metro. Sch. Dist.*, Dec. No. 16598 (WERC, 10/78). Although the Association acknowledges that WERC has historically treated teacher prep time differently than break periods, the Association submits that here, prep time is analogous to a break period, because teachers do not have a work assignment.[9] The Association further argues that the manner in which the District calculated overload, and the District's cost-based reason for eliminating prep time, also suggest teacher prep time is a break period and therefore, a mandatory subject of bargaining. While our analysis proceeds under the great weight standard, we would affirm WERC's decision under the due weight standard as well, because the Association's view of teacher prep time as analogous to break time, is not more reasonable than WERC's decision.

¶ 30. Applying the great weight standard, we will affirm WERC's conclusion that teacher prep time is a permissive subject of bargaining if "the agency's view of the law is reasonable even though an alternative view is also reasonable." *West Bend*, 121 Wis. 2d at 13–14. We will uphold WERC's conclusion if it has "any rational

---

[9] The Association, however, does not distinguish how teacher prep time in this case is used differently than prep time in WERC's previous decisions.

basis." *Blackhawk Teachers' Fed'n,* 109 Wis. 2d at 424. We are satisfied that WERC's determination that teacher prep time is a permissive subject of bargaining has a rational basis, because WERC's decision is consistent with previous decisions, and in making its decision, WERC employed the "primarily related" test.[10]

¶ 31. In order to determine if teacher prep time is primarily related to educational policy or primarily related to wages, hours, and conditions of employment, WERC examined the record and used the balancing test. Relying on testimony of District Superintendent McLeod, WERC found that the educational policy im-

_____

[10] We disagree with the dissent's conclusion that WERC erroneously concluded that teacher preparation time is a permissive subject of bargaining because WERC relied on *Oak Creek-Franklin Joint City Sch. Dist. No. 1,* Dec. No. 11827–D (WERC, 9/74), dissent at ¶¶ 75–76, and WERC "never conducted any real balancing of the interests in this case." Dissent at ¶ 78. We also disagree with the dissent's assertion that WERC did not "provide[] any real reasons why the interests in school management outweigh the interests of teachers in maintaining their negotiated hours and working conditions." *Id.* The dissent, however, ignores the proper standard of review to be applied to WERC's decision on this issue. Based on the fact that all four factors of *MCI Telecomm. Corp. v. State,* 209 Wis. 2d 310, 318, 562 N.W.2d 594 (1997), have been met, we review WERC's decision under the great weight deference standard and uphold the decision because it has a rational basis. *See Blackhawk Teachers' Fed'n v. WERC,* 109 Wis. 2d 415, 424, 326 N.W.2d 247 (Ct. App. 1982). Accordingly, we uphold WERC's decision on this issue as reasonable, because WERC did examine the record and did use the proper balancing test. Further, our analysis of this issue involves application of the great weight standard of review, and because the dissent does not give WERC's decision the great weight, or even the due weight, that should be accorded to it, we disagree with the dissent's conclusion.

plications of the allocation of a teacher work day outweighed the impact on teacher hours and conditions of employment. Specifically, WERC stated,

[W]e are satisfied that the amount of preparation time provided to teachers during the workday directly impacts on fundamental educational policy issues such as: (1) how many and what types of classes can be offered to students; (2) how will existing school buildings be used; and (3) how should the student day be structured. Balanced against this impact on educational policy choices is the impact on employe[e] hours and conditions of employment generated by the reality that: (1) if teachers do not receive preparation time during the scheduled work day, the various tasks typically accomplished during preparation time ... will need to [be] performed at times outside the scheduled work day; and (2) to the extent preparation time can legitimately be used as paid break time, reduced preparation time reduces break time.

Dec. No. 29490 at 20. Based on this analysis, we arrive at the same conclusion as the court of appeals: "[T]he commission engaged in a proper balancing of the impacts of teacher preparation time on educational policy, as opposed to its impact on teachers' hours and conditions of employment, and reached a rationally-based conclusion that the former outweighed the latter." *Dodgeland Educ. Ass'n,* 240 Wis. 2d 287, ¶ 32. Accordingly, we affirm WERC's decision that teacher prep time is a permissive subject of bargaining.

## V

¶ 32. We next examine whether WERC correctly decided that teacher prep time is not a "fringe benefit" under Wis. Stat. § 111.70(1)(nc)1.a. The parties again dispute what level of deference this court should apply

to WERC's interpretation of the statute. The Association argues that de novo review is proper because the definition of fringe benefit, within the context of a QEO, is an issue of first impression. Although WERC has had previous experience interpreting the bargaining system, the Association contends that the QEO system represents a very different dispute resolutions system. Accordingly, the Association argues this court should give no deference to WERC's decision.

¶ 33. In contrast, the District and WERC argue that WERC's decision that prep time is not a fringe benefit is entitled to great weight deference. The District and WERC contend that, in this instance, WERC's decision meets all four factors to be afforded great weight deference. *See MCI Telecomm. Corp.,* 209 Wis. 2d at 318. The District and WERC argue that WERC meets the first factor because the legislature has clearly charged WERC with applying and enforcing the MERA. The District argues that the second factor is met because WERC has been resolving QEO and fringe benefit issues for almost ten years. WERC takes a more conservative position on the second factor, conceding that the dispute here centers on whether WERC's interpretation is long-standing. WERC frames the issue as whether a QEO exists and recognizes that in *Racine Education Association v. WERC,* 2000 WI App 149, 238 Wis. 2d 33, 49, 616 N.W.2d 504, *review denied,* 2000 WI 121, 239 Wis. 2d 309, 619 N.W.2d 92, the court of appeals applied due weight deference to that same question. WERC submits, however, that great weight deference should be applied here because in promulgating Wis. Admin. Code § ERC 33, it gained extensive additional experience with interpreting Wis. Stat. § 111.70(1)(nc)1.a.

¶ 34. According to the District and WERC, the third and fourth factors are also met. WERC used its experience and expertise in determining whether a QEO exists, as well as whether a bargaining subject is mandatory or permissive. Under the fourth factor, deference to WERC's decision will provide uniformity in applying and harmonizing the provisions of MERA, including the QEO amendments.

¶ 35. We are satisfied that WERC's decision meets three of the four factors. Clearly, WERC was charged with the duty of administering Wis. Stat. § 111.70. WERC has had considerable experience in interpreting fringe benefit issues in other contexts and interpreting many aspects of the QEO provisions. WERC's interpretation will also provide consistency and uniformity in the application of MERA. This case, however, presented WERC with its first opportunity to consider whether a district's failure to renew a teacher prep time memorandum precludes it from making a QEO under § 111.70(1)(nc)1.a., because prep time is a fringe benefit. Accordingly, there is no long-standing interpretation of fringe benefits in this context and the question before us is at least "very nearly" one of first impression. Under the circumstances, we afford due weight deference to WERC's decision that teacher prep time is not a fringe benefit under § 111.70(1)(nc)1.a.

¶ 36. Under the due weight standard, "a court need not defer to an agency's interpretation which, while reasonable, is not the interpretation which the court considers best and most reasonable." *Harnischfeger*, 196 Wis. 2d at 660 n.4. Due weight deference breaks the tie between competing reasonable conclusions in favor of the agency's decision. *UFE Inc.*, 201 Wis. 2d at 287. We will "not overturn a reasonable

agency decision that comports with the purpose of the statute unless [we] determine[] that there is a more reasonable interpretation available." *Id.* at 286–287. In this case, we will only overturn WERC's decision if we determine that the Association's interpretation that teacher prep time is a fringe benefit is more reasonable.

¶ 37. We first look at WERC's decision to determine if it is reasonable and if it furthers the purpose of Wis. Stat. § 111.70. In deciding that teacher prep time is not a fringe benefit, WERC first looked at MERA as it existed prior to the QEO amendments, and what the District's obligations would have been with regard to both the prep time memorandum and the Association's impact proposal. Dec. No. 29490 at 21. Because the prep time memorandum is a permissive subject of bargaining, the District would: 1) have had the right to allocate preparation time as it saw fit once the memorandum expired by its own terms; 2) have had no duty to bargain over the inclusion of the memorandum in a successor agreement; and 3) have had no obligation to proceed to interest arbitration over the inclusion of the memorandum in a successor agreement. *Id.* With regard to the Association's impact proposal (requesting compensation for work overload), however, as a mandatory subject of bargaining, the District would have had an obligation to bargain over the impact proposal and could be compelled to proceed to interest arbitration over the inclusion of the impact proposal in successor agreements. *Id.*

¶ 38. After 1993 Wis. Act 16, the District must make a valid QEO to avoid interest arbitration of "economic issues." *See* Wis. Stat. § 111.70(4)(cm)5s. In order to make a valid QEO, pursuant to § 111.70(1)(nc)1.a., the District must maintain all

"fringe benefits." In its decision, WERC proceeded to evaluate how a permissive subject of bargaining affected this QEO requirement, concluding that "fringe benefits" do not include permissive subjects of bargaining. Dec. No. 29490 at 23–24.

¶ 39. We find that WERC's interpretation of fringe benefits is reasonable because it is based on the ordinary and accepted meaning. Since the term "fringe benefits" is not defined in Wis. Stat. § 111.70, or elsewhere in the statutes, WERC looked to dictionary definitions to apply the ordinary and accepted meaning. *See Brown County Attorneys Ass'n v. Brown County,* 169 Wis. 2d 737, 742, 487 N.W.2d 312 (Ct. App. 1992). WERC looked to *Roberts' Dictionary of Industrial Relations* (4th ed., BNA, 1994), defining "fringe benefits" as: "Non-wage or indirect compensation received by workers, paid for in whole or in part by employers, including such items as vacations, sick leave, holidays, pensions and insurance." WERC also looked to the definition of fringe benefits in *Webster's Third New International Dictionary* 912 (Unabr. 1976), as cited in *Brown County Attorneys Ass'n,* 169 Wis. 2d at 742: "[A]n employment benefit . . . granted by an employer that involves a money cost without affecting basic wage rates."[11] In order to determine reasonableness, we also look to the definition of fringe benefits from *Black's Law Dictionary* 151 (7th ed. 1999): "A

___

[11] The District points out that the court of appeals in *Brown County Attorneys Association v. Brown County,* 169 Wis. 2d 737, 487 N.W.2d 312 (Ct. App. 1992), failed to cite the complete definition of "fringe benefits" from *Webster's Third New International Dictionary.* The complete dictionary definition of fringe benefits states: "[A]n employment benefit (as a pension, a paid holiday, or health insurance) granted by an employer that involves a money cost without affecting basic wage rates."

benefit (other than direct salary or compensation) received by an employee from an employer, such as insurance, a company car, or a tuition allowance." Based on the ordinary and accepted definitions, WERC concluded that fringe benefits do not include prep time. Although prep time may be viewed as "non-wage" or "indirect compensation," WERC concluded that the examples of fringe benefits were distinguishable from prep time because the examples were all mandatory subjects of bargaining. WERC's interpretation of fringe benefits, based on the ordinary and accepted meaning, is therefore, reasonable.

¶ 40. WERC's interpretation of fringe benefits is also reasonable because permissive subjects of bargaining have never been deemed fringe benefits in Wisconsin courts. WERC reviewed numerous instances wherein Wisconsin courts used the term "fringe benefit," and in all instances the fringe benefit was a mandatory subject of bargaining.[12] WERC also noted that in previous WERC decisions interpreting Wis. Stat. § 111.70(1)(nc)1.a., the fringe benefits in question were mandatory subjects of bargaining. *See Madison*

---

[12] In its decision, WERC cited the following cases:

*Brown County, supra* – seminar fees and bar dues, beeper pay, mileage reimbursement, casual day disability plan; *City of Brookfield v. WERC,* 153 Wis. 2d 238 (Ct. App. 1989) – health insurance benefits; *Koenings v. Joseph Schlitz Brewing Co.,* 123 Wis. 2d 490 (Ct. App. 1985) – insurance (medical, dental[,] vision, life, travel accident, personal accident) retirement, stock ownership, relocation benefits; *Ferraro v. Koelsch,* 124 Wis. 2d 154 (1985) – bonus, pension plan; *Kimberly-Clark Corp. v. LIRC,* 95 Wis. 2d 558 (Ct. App. 1980) – disability insurance; *Goodyear Tire & Rubber Co. v. DILHR,* 87 Wis. 2d 56 (Ct. App. 1978) – sickness and disability payments; *Ford Motor Credit Co. v. Amodt,* 29 Wis. 2d 441 (1966) – use of a car.

*Metro. Sch. Dist.*, Dec. No. 27612–B (WERC, 4/95) (holidays, convention days and snow days); *Campbellsport Sch. Dist.*, Dec. No. 27578–B (WERC, 8/94) (health insurance). Finally, WERC looked at other instances where the phrase "fringe benefits" is used in Wisconsin Statutes and found nothing suggesting that the matters referenced include permissive subjects of bargaining.[13] WERC's consistency with previous decisions, and other statutes, strengthens the reasonableness of WERC's interpretation that fringe benefits do not include permissive subjects of bargaining.

¶ 41. In addition to being reasonable, WERC's interpretation of fringe benefits furthers the purpose of Wis. Stat. § 111.70. WERC's decision that fringe benefits do not include permissive subjects of bargaining is consistent with the purpose of MERA, requiring only that municipal employers bargain over matters that are mandatory subjects of bargaining. *See* Wis. Stat. § 111.70(1)(a). The QEO amendments did not change the underlying purpose of MERA, still reserving educational policy decisions for school districts. By interpreting fringe benefits so as not to include permissive subjects of bargaining, WERC established a reasonable line of demarcation for deciding what is a fringe benefit, furthering the purpose of MERA.

¶ 42. In order to apply the due weight standard, we now look to the Association's interpretation of fringe benefits to determine if it is reasonable. The Association argues that the term "fringe benefits" under Wis.

---

[13] WERC examined the following Wisconsin Statutes: Sections 7.33; 11.01; 11.40; 16.336; 16.964; 19.21; 20.455; 20.475; 20.865; 20.925; 20.928; 40.02; 40.05; 46.935; 50.05; 66.11; 67.04; 100.201; 111.17; 111.34; 111.91; 111.92; 111.93; 118.245; 119.55; 165.85; 230.12; 230.26; 230.36; 234.94; 440.945; 560.14; 753.07; 758.19; 978.045; 978.12.

Stat. § 111.70(1)(nc)1.a., should be interpreted to include teacher prep time and should not be limited to mandatory subjects of bargaining. The Association acknowledges that MERA does not define "fringe benefits," but argues that the legislature intended to use the definition of fringe benefits previously established in *Brown County. See State v. Rosenburg,* 208 Wis. 2d 191, 194–95, 560 N.W.2d 266 (1997) (assuming lawmakers know the law in effect at the time the legislature acted). Relying on that definition, the Association argues that prep time is a fringe benefit because it involves " 'a money cost [to employers] without affecting basic wage rates.' " *See Brown County,* 169 Wis. 2d at 742–43 (quoting dictionary definition). Providing teacher prep time has a cost to the District, because allowing prep time requires hiring additional teachers to cover the hours of prep time. Furthermore, the Association contends prep time is a fringe benefit because it is of substantial value to the teachers and is not reflected in the basic wage rates.

¶ 43.　The Association also takes the position that its interpretation of fringe benefits is more reasonable than WERC's decision, because WERC's limitation of fringe benefits to mandatory subjects of bargaining was unreasonable and beyond its authority. The Association contends that when enacting the QEO amendments, the legislature's failure to specify that fringe benefits only include mandatory subjects of bargaining, demonstrates fringe benefits should not be so restricted. The Association argues that its interpretation of fringe benefits is more reasonable because many matters primarily related to educational policy—and which are permissive subjects of bargaining—also have a benefit to teachers and a money cost to the District—and would be a fringe benefit. Accordingly, the Association con-

390

tends that the mandatory/permissive distinction is not an appropriate factor for interpreting fringe benefits.

¶ 44. The Association further argues that its interpretation of fringe benefits is reasonable because the QEO amendments were intended only to give the District a choice. The District can live with the status quo on all current fringe benefits and avoid interest arbitration on all economic issues, or it can propose changes and engage in traditional bargaining. The Association contends that the QEO amendments were not intended to limit fringe benefits to mandatory subjects of bargaining, essentially allowing a District to submit a QEO but refuse to maintain fringe benefits that are permissive subjects of bargaining.

¶ 45. We find the Association's interpretation of fringe benefits in Wis. Stat. § 111.70(1)(nc)1.a. is also reasonable. The Association's interpretation is reasonable because "It focuses on the language of the statute, arguably relevant case law, and colorable claims as to the legislative purpose and intent behind the qualified economic offer provisions." *Dodgeland,* 2000 WI App 260, ¶ 24.

¶ 46. Applying the due weight standard of review, however, we do not find the Association's interpretation more reasonable than WERC's interpretation.[14] By en-

[14] We disagree with the dissent's conclusion that the Association's definition of fringe benefit (from *Brown County Attorneys Ass'n v. Brown County,* 169 Wis. 2d 737, 487 N.W.2d 312 (Ct. App. 1992) is more reasonable than WERC's definition. Dissent at ¶¶ 65–66. The dissent reasons that WERC's definition ignores the proper balance between labor and management, fails to give credence to the legislature's specific word choice, and is circuitous. Dissent at ¶¶ 67–69. The dissent, however, does not address the fact that WERC's definition of fringe benefit is based on the ordinary and accepted meaning, is

acting the QEO amendments, the legislature intended to limit the occasions that a school district can be required to submit to interest arbitration. WERC's interpretation of fringe benefits, as not including permissive subjects of bargaining, furthers this purpose. In addition, we do not agree with the Association and the dissent that the definition of fringe benefits stated in *Brown County* is controlling. *See* dissent at ¶ 65. In that case, the court of appeals interpreted the meaning of fringe benefits under Wis. Stat. § 978.12(6);[15] the obligations and rights under MERA and the QEO amendments were not at issue. Furthermore, in deciding that fringe benefits do not include permissive subjects of bargaining, WERC was being consistent with previous WERC decisions, previous case law, and other statutes. We conclude, therefore, that WERC's decision that under § 111.70(1)(nc)1.a., fringe benefits do not include permissive subjects of bargaining, should be upheld.

### VI

¶ 47. In sum, we affirm WERC's decision on all issues. We first affirm WERC's decision that teacher prep time is a permissive subject of bargaining. Based

---

consistent with previous decisions and other statutes, and furthers the purpose of MERA. Applying the due weight standard of review to this issue, we therefore disagree with the dissent's conclusion that the Association's definition of fringe benefit is more reasonable than WERC's definition.

[15] In *Brown County Attorneys Association v. Brown County*, 169 Wis. 2d 737, 487 N.W.2d 312 (Ct. App. 1992), the court of appeals interpreted fringe benefits under Wis. Stat. § 978.12(6), which provided that prosecutors making the transition to state employment could opt to remain covered by a county's fringe benefit plan in lieu of state benefits.

on WERC's long-standing interpretation of permissive and mandatory subjects of bargaining, we reviewed WERC's decision under the great weight deference standard. WERC made its decision by employing the "primarily related" balancing test, holding that teacher prep time is a permissive subject of bargaining because it is primarily related to educational policy. Accordingly, we affirm WERC's decision because it had a rational basis.

¶ 48. We also reviewed WERC's decision that teacher prep time is not a fringe benefit under Wis. Stat. § 111.70(1)(a). Affording that decision due weight deference, we found that WERC's interpretation of fringe benefits is reasonable and furthers the purpose of MERA, because it is based on the ordinary and accepted meaning, and is consistent with previous case law. We found the Association's interpretation of fringe benefits under § 111.70(1)(a) also reasonable, but not more reasonable than WERC's interpretation. Under the due weight deference standard, we, therefore, affirm WERC's decision that teacher prep time is not a fringe benefit under § 111.70(1)(a).

¶ 49. Finally, we also affirm WERC's conclusions on two additional issues: (1) that the District submitted a valid QEO under Wis. Stat. § 111.70(4)(cm)5s., and (2) that the Association cannot proceed to interest arbitration over the impact proposal (asking for compensation for work overload). Because teacher prep time is a permissive subject of bargaining and is, therefore, not a fringe benefit, the District was not required to continue the prep time guarantee in order to submit a valid QEO. We affirm WERC's conclusion that the District submitted a valid QEO under § 111.70(1)(nc)1.

¶ 50. With regard to the second additional issue, under Wis. Stat. § 111.70(4)(cm)5s., neither party can proceed to interest arbitration over economic issues if there is a valid QEO. WERC concluded that the Association's impact proposal was an economic issue because it implicates salaries, extra duty pay, and temporary assignment pay, all components of an economic issue as defined in § 111.70(1)(dm). We have already determined the District submitted a valid QEO. Consequently, we also affirm WERC's decision that the Association cannot proceed to interest arbitration over the impact proposal because it is an economic issue.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 51. WILLIAM A. BABLITCH, J. (*dissenting*). When examining the history of collective bargaining legislation concerning teachers and schools in Wisconsin and the expressed intent of the legislature, it is clear that the purpose of this legislation has been to place the parties on equal footing, thereby promoting good faith bargaining and voluntary settlements between the parties. *See* Wis. Stat. § 111.70(6)(1997–98). Indeed, even when voluntary settlements are not obtainable, the legislature has implemented fair, effective, speedy, and peaceful procedures to resolve impasse.

¶ 52. In some instances, however, the legislature has eliminated significant rights of teachers normally afforded to others in the collective bargaining process. One example is the legislature's elimination of the teachers' right to strike. A more recent example is 1993 Wis. Act 16 (the QEO law), which eliminated the rights of teachers to bring certain issues to interest arbitration when a valid qualified economic offer (QEO) is

submitted. Today, the majority opinion, not the legislature, adds to the list by eliminating another significant right for teachers—the right to bargain over an established fringe benefit, teacher preparation time.

¶ 53. I agree with the well-reasoned dissent of Wisconsin Employment Relations Commissioner A. Henry Hempe from this case that it is one thing for the legislature to create this imbalance but quite another for a court to do so.[1]

¶ 54. In its interpretation of "fringe benefits," the majority fails to recognize the significant bargaining power granted to school districts under the QEO law and fails to interpret the statute in light of the overall purpose of collective bargaining legislation, that is, to maintain a level playing field for both labor and management. The effect of the majority opinion is further chip away at the collective bargaining rights of teachers. Indeed, if the QEO law is interpreted to permit school districts to unilaterally eliminate something as valuable to teachers as preparation time without their ability to bargain collectively on this issue, the future

---

[1] In relevant part, Commissioner Hempe stated:

Moreover, as demonstrated by this case, excluding fringe benefits that are permissive subjects of bargaining from the purview of Sec. 111.70(1)[(nc)]1.a., Stats., is simply unfair. Under apparent color of law the teachers are peremptorily stripped of their previous legal right to arbitrate the economic impact of the loss of their benefit without any compensatory recourse. For this to be done by the Legislature is one matter. But for it to be done in the course of a quasi-judicial review in the absence of a legislative mandate to do so is quite another, and in this instance in total disharmony with apparent legislative efforts to create a balanced *quid pro quo.*

*Dodgeland Sch. Dist. v. Dodgeland Educ. Ass'n,* Dec. No. 29490 (WERC, 1/99), 29 (Hempe, dissenting).

for fair collective bargaining between Wisconsin teachers and school districts is bleak. I therefore must respectfully dissent.

## I

¶ 55. The threshold issue in this case is whether teacher preparation time is a fringe benefit. A valid QEO must include all preexisting fringe benefits. The Dodgeland School District (District) discontinued a memorandum of understanding regarding teacher preparation time before submitting its QEO. If the guarantee of teacher preparation time is a fringe benefit, the QEO is not valid and the issue is subject to bargaining or arbitration. If it is not a fringe benefit, the QEO is valid and the issue is not subject to arbitration. Thus, the battle lines are drawn. I conclude that teacher preparation time is a fringe benefit.

¶ 56. Before defining "fringe benefit" under the statute, it is important to examine the history of municipal employee collective bargaining legislation in Wisconsin to provide necessary context to the definition.

¶ 57. In 1959, Wisconsin became one of the first states in the country to provide for collective bargaining rights to municipal employees through legislation.[2] Municipal employees were granted significant rights under the new legislation, including the right to self-organize, to affiliate with labor organizations, and to negotiate with their municipal employers.[3] The legislation was, however, limited: negotiations were re-

---

[2] Chapter 509, Laws of 1959.

[3] Charles C. Mulcahy & Gary M. Ruesch, *Wisconsin's Municipal Labor Law: A Need for Change,* 64 Marq. L. Rev. 103, 107 (1980) (citing Wis. Stat. § 111.70(2)(1959)).

stricted to questions of wages, hours and conditions of employment, no impasse resolution procedures were provided, and no requirement to negotiate in good faith was contained in the law.[4]

¶ 58. In 1961, new legislation was enacted that further encouraged fair collective bargaining, including authority to the Wisconsin Employment Relations Board (which later became the Wisconsin Employment Relations Commission) to function as a mediator in disputes and to administer fact-finding procedures.[5] Despite this progress, the law was still limited in its fair resolution procedures: it did not provide for compulsory binding impasse procedures and it depended on voluntary agreements between the parties.[6] At the same time, employees were denied significant leverage when strikes were expressly prohibited under the law.[7] In 1971, amendments were again enacted, which provided for binding interest arbitration for law enforcement officials and firefighters.[8] At that time, however, arbitration was not permitted for school employees.

---

[4] *Id.*

[5] Chapter 663, Laws of 1961; Mulcahy & Ruesch, *supra,* at 107–08 (citing Wis. Stat. § 111.70(4)(b),(f)(1961)).

[6] *Id.* at 108.

[7] Wis. Stat. § 111.70(4)(L)(1961). Mulcahy and Ruesch also observed the following:

> The right of a union to strike is a necessary component to balance the relationship between municipal employers and public employee unions. Absent this right, unions are without the leverage which traditionally has been available to their private sector counterparts. As a result of this denial, the public sector collective bargaining process remained unbalanced until public employee unions resorted to illegal strikes.

Mulcahy & Ruesch, *supra,* at 121.

[8] Chapters 124, 246, 247, 307, and 336, Laws of 1971.

¶ 59. Fair collective bargaining in schools came to the forefront in the early 1970s due to the frequency of teacher strikes during that time. Indeed, even though illegal, strikes were the only real leverage tool for teachers if the school districts refused to bargain in good faith. The most noted teacher strike took place in Hortonville in 1974 when 95 teachers went on strike and the Hortonville School District subsequently fired and replaced all of the teachers.[9] This and other strikes in large part contributed to a new political climate for change in the collective bargaining law.[10]

¶ 60. Reform came in 1977 with the introduction of the mediation arbitration law, which provided for compulsory final and binding interest arbitration for nearly all municipal employees not governed by the 1971 amendments.[11] From the introduction of this law to the time of the enactment of the QEO law in 1993, public school teachers in Wisconsin received higher raises in salary than many of their counterparts in other states.[12] This rise in teacher salaries left some with the impression that the teachers had the upper hand in collective bargaining.[13] New legislative proposals were again examined.

¶ 61. In 1993, the legislature amended the municipal employee relations law.[14] These amendments were regarded as efforts not only to shift some bargain-

---

[9] Mulcahy & Ruesch, *supra,* at 104, n.4.

[10] *Id.* at 106.

[11] Chapter 178, Laws of 1977.

[12] Lawrence Sussman, *Teachers Gain Under State's Arbitration Law,* Milwaukee J., Nov. 26, 1992, at B3.

[13] Jeff Mayers, *Budget Seeks to Cap Teachers,* Wis. St. J., Feb. 3, 1993, at D3.

[14] 1993 Wis. Act 16.

ing power to the school districts, but also to allow municipalities to control rising property taxes by controlling teacher salaries.[15] The amendments attempted to achieve these goals by allowing the school districts to avoid collective bargaining if it submitted a valid QEO.

¶ 62. This history, leading up to the current QEO law, reveals the constant struggle by the legislature to maintain equal footing for labor and management to ensure fair and effective collective bargaining. We must bear this overall objective in mind in our interpretation of "fringe benefits" under the current QEO law.

¶ 63. Indeed, the QEO law created a new procedure in teacher and school collective bargaining. School districts may now avoid collective bargaining on certain issues and maintain their costs by submitting a valid QEO. A valid QEO guarantees that school districts will not be subject to any additional costs beyond the statutory increase for wages and fringe benefits. The statute ensures this by allowing the district to avoid interest arbitration on "economic issues," which are defined as "any issue that creates a new or increased financial liability upon the municipal employer . . ."[16] Clearly then, this law was designed to provide the school districts with more control over their costs and resulted in increased bargaining power for the school districts.

¶ 64. This law, however, does not provide a win-win situation for the school districts. At the same time the statute allows the districts to avoid arbitration and provide only a minimum statutory increase, they must

---

[15] Richard P. Jones, *Governor Seeks Tax Relief on Arbitration, Mandates,* Milwaukee J., Feb. 3, 1993, at 1.

[16] Wis. Stat. § 111.70(1)(dm),(4)(cm)5s.(1997–98).

maintain all fringe benefits.[17] In other words, school districts are not permitted the benefit of both avoiding new costs and eliminating old costs. Indeed, in light of the advantages provided to school districts under this law and the overall objective of maintaining equal bargaining power between the parties, it makes sense to interpret "fringe benefits" under Wis. Stat. § 111.70(1)(nc)1.a.(1997–98) broadly to encompass any costs that the schools currently incur. Indeed, it makes sense to interpret this term consistent with the definition for "economic issues," that is, as any "financial liability upon the municipal employer." Such an interpretation gives full effect to the legislature's efforts to maintain a level playing field and recognizes the balance that the statutory scheme requires.

¶ 65. To this end, I would adopt the court of appeals' definition of "fringe benefits" in *Brown County Attorneys Ass'n v. Brown County,* 169 Wis. 2d 737, 487 N.W.2d 312 (Ct. App. 1992). The court properly identified "fringe benefits" as costs to the employer. This definition defines a "fringe benefit" as: " '[A]n employment benefit . . . granted by an employer that involves a money cost without affecting basic wage rates.' " *Id.* at 742–43 (citation omitted).

¶ 66. I conclude that this definition is more reasonable than the definition provided by the Wisconsin Employment Relations Commission (WERC) in this case for several reasons.

¶ 67. First, WERC's interpretation ignores the proper balance that must be achieved between labor and management when interpreting this statute.

¶ 68. Second, WERC's definition of fringe benefits as "mandatory subjects of bargaining" fails to give

---

[17] Wis. Stat. § 111.70(1)(nc)1.a.(1997–98).

credence to the legislature's specific word choice. The legislature specifically incorporated the phrase "fringe benefits," not "mandatory subjects of bargaining" into the statute. The legislature certainly could have used this latter phrase, as it has in other sections of the collective bargaining law. It did not. Indeed, instead of providing an actual definition for "fringe benefits," WERC essentially rewords the statute, replacing "fringe benefits" with "mandatory subjects of bargaining." The legislature could not have intended this result.

¶ 69. Third, WERC arrives at the definition of "fringe benefits" through highly circuitous and questionable reasoning. In essence, it defines fringe benefits by arriving at the conclusion first. It essentially begins its analysis with the conclusion that fringe benefits are "mandatory subjects of bargaining," and then examines prior definitions and interpretations of "fringe benefit" to determine whether they are consistent with "mandatory subjects of bargaining." WERC then determines that teacher preparation time cannot be a fringe benefit because it is a permissive subject of bargaining. This approach is particularly problematic in light of the fact that, before it even begins its effort to define "fringe benefits," WERC had already determined that teacher preparation time was a permissive subject of bargaining.

¶ 70. Collectively, these concerns lead me to the conclusion that WERC's definition is unreasonable. Accordingly, under any level of deference, I would reverse WERC's decision.

¶ 71. Having established a reasonable definition for "fringe benefit," the next question becomes whether teacher preparation time falls under this definition. I conclude that it does because it is a benefit that involves a true money cost to the employer.

¶ 72. Teacher preparation time is time during the academic day that the teachers spend to prepare for their lessons. The teachers negotiate this time so that they may prepare during the academic day and spend less time preparing outside the academic day, which is time that is uncompensated. Thus, there is a real value for teachers in this preparation time and a real cost to employers because the teachers would likely require increased pay for additional student contact time. Indeed, the District recognized as much in this case by offering additional compensation to the teachers for any teacher that was willing to work during their preparation time.

¶ 73. To equate teacher preparation time with break time ignores the practical significance of it to teachers. Teachers must be prepared to conduct their lessons every day and provide quality education to our children. A full day of lessons without any preparation time during the day results not only in a lower wage rate for teachers because additional uncompensated hours are required outside of the classroom, but also in lower quality of education for our children. Thus, preparation time is a "fringe benefit." Accordingly, I conclude that the District failed to submit a valid QEO.

## II

¶ 74. I also disagree with the majority's conclusion that WERC's decision must be affirmed based on the definition of "fringe benefits" as "mandatory subjects of bargaining." In its decision, WERC concluded that teacher preparation time is not primarily related to wages, hours, and conditions of employment. The "primarily related" test is applied on a case-by-case basis, which weighs the competing interests of the public, employee, and the employer in determining "whether a

402

proposed subject for bargaining should be characterized as mandatory." *West Bend Educ. Ass'n v. WERC,* 121 Wis. 2d 1, 9, 357 N.W.2d 534 (1984). Applying this test, I conclude that teacher preparation time is primarily related to wages, hours, and conditions of employment, and accordingly a mandatory subject of bargaining.

¶ 75. Under any level of deference, I would not affirm WERC's decision in this respect because I find its analysis incomplete and unreasonable. In its determination, WERC relied in part on *Oak Creek-Franklin Joint City Sch. Dist. No. 1,* Dec. No. 11827–D (WERC, 9/74). In *Oak Creek-Franklin,* WERC reviewed a proposal put forth by the Oak Creek Education Association concerning the teachers' load, which included (1) a required number of hours with students, (2) a required number of classes for each teacher to teach and a number of required preparations for these classes, and (3) guaranteed preparation periods per day. *See Dodgeland Sch. Dist. v. Dodgeland Educ. Ass'n,* Dec. No. 29490 (WERC, 1/99), 18–19 (discussing *Oak Creek-Franklin*). WERC concluded that this proposal from the Oak Creek Education Association concerned permissive subjects of bargaining, stating that "[s]uch decisions directly articulate the District's determination of how quality education may be attained and whether to pursue the same." *See id.* at 19. The circuit court reviewed this *Oak Creek-Franklin* decision from WERC and affirmed, stating:

> We recognize that the subjects of the proposal here may have a significant effect on teacher's total workload. But one could also look at the proposals from another perspective: The Association's proposals relate to the allocation of a teacher's work day. *The allocation of the time and energies of its teachers is a consequence of basic educational policy decisions on the*

403

*part of the District. It is not without reason to conclude that those decisions significantly affect the quality of education offered in the District.*

*See id.* (emphasis added).

¶ 76. I certainly agree with the conclusions reached in *Oak-Creek Franklin* that any decision by school districts concerning the allocation of a teacher's time and energies significantly affects the quality of education. But that only begins the inquiry. It is difficult to imagine any significant decision made by a school district as not affecting the quality of education. Even wages can affect the quality of education. Thus, *Oak-Creek Franklin*'s analysis was incomplete, and WERC should not have relied on it in this case.

¶ 77. There can be no question that teacher preparation time directly and clearly impacts the hours and conditions of employment of employees.[18] It is

[18] This conclusion is supported by a number of jurisdictions: *Nat'l Educ. Ass'n-Kansas City v. Unified Sch. Dist. No. 500, Wyandotte County,* 608 P.2d 415, 418 (Kan. 1980) (holding that a proposal for a seven and one-half hour work day including 30 minutes daily teacher preparation time without assigned duties during such period reasonably fell within the category of "hours and amounts of work" and therefore was mandatorily negotiable); *Foley Educ. Ass'n v. Indep. Sch Dist. No. 51,* 353 N.W.2d 917, 921 (Minn. 1984) (court held that school district's decision to reduce teacher preparation time was a mandatory negotiable subject because such a decision increases student contact time and may lengthen teachers' hours of employment); *Clark County Sch. Dist. v. Local Gov't Employee Mgmt. Relations Bd.,* 530 P.2d 114, 116–17, 119 (Nev. 1975) (court upheld determination by agency as reasonable that teacher preparation time significantly related to wages, hours, and working conditions and was therefore negotiable); *Red Bank Bd. of Educ. v. Warrington,* 351 A.2d 778, 784 (N.J. 1976) (court held that decision by school board to require teachers to

negotiated not because it affects the quality of education but because it directly impacts the hours of teaching. The only real question is whether and for how long it will be compensated. The teachers bargain for it in order to avoid preparation time outside the academic day that is not compensated. Indeed, this does not take into consideration the numerous hours teachers spend volunteering for different school-related activities, including lunch supervision, after-school clubs, parent-teacher conferences, and many other activities. As a result, teacher preparation time must be considered a mandatory subject of bargaining.

¶ 78. In addition, in this case, although WERC argued that teacher workload also impacts on other educational policy issues—including (1) the types of classes offered to students, (2) building use, and (3) student schedules—it never conducted any real balancing of the interests in this case nor provided any real reasons why the interests in school management outweigh the interests of teachers in maintaining their negotiated hours and working conditions. *Dodgeland Sch. Dist.,* Dec. No. 29490 at 20. WERC merely concluded:

> Here, based on the record before us, we conclude that when the preparation time memorandum's impact

---

teach during a previously unassigned and free period was a decision that directly concerned the teachers' work load and thus clearly affected the terms and conditions of their employment). *Compare Kenai Peninsula Borough Sch. Dist. v. Kenai Peninsula Educ. Ass'n,* 572 P.2d 416, 423 (Alaska 1977) (court held that elementary school teachers' request for planning period during the academic portion of the day presented a policy question because, even though a mere request for planning time might be negotiable, this question presented an additional complication, that is, whether elementary school children were old enough to be taught by different people throughout the day).

on educational policy is balanced against the impact on teachers' hours and conditions of employment, the memorandum is primarily related to educational policy and thus is a permissive subject of bargaining.

*Id.* The majority simply adopts this reasoning as "proper balancing." Majority op. at ¶ 31. I would not.

¶ 79. For the reasons stated above, I respectfully dissent.

¶ 80. I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON and Justice ANN WALSH BRADLEY join this dissent.

